**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| MICHAEL D. WARNER, solely in his official capacity as Chapter 7 Trustee of COX OPERATING L.L.C., MLCJR, LLC, COX OIL OFFSHORE, L.L.C., ENERGY XXI, GOM, LLC, ENERGY XXI GULF COAST, LLC, EPL OIL & GAS, LLC, AND M21K, LLC, | * * * * * * | |
| | * | CIVIL ACTION AND |
| | * | ADVERSARY PROCEEDING NO. |
| Plaintiff, | * | 2025-CV-943 |
| | * | |
| VERSUS | * | |
| | * | |
| BRAD E. COX, CRAIG SANDERS, VINCENT DEVITO, ARDEN TRUST COMPANY IN ITS CAPACITY AS TRUSTEE OF THE BRADLEY EDWIN COX TRUST, CRAIG SANDERS AND WILLIAM GRAHAM IN THEIR CAPACITIES AS CO-TRUSTEES OF THE CHARLEE LOCHRIDGE COX DYNASTY TRUST, WILLIAM GRAHAM IN HIS CAPACITY SS TRUSTEE OF THE EDWIN L. COX "B" TRUST, CLS DEVELOPMENT, LLC, COX INTERESTS, LLC, COX INVESTMENT PARTNERS, LP, COX GATHERING LLC, COX MANAGEMENT DALLAS, LLC, COX OIL AND GAS, LLC, COX OIL LLC, CW FACILITIES, LLC, DALLAS ESTATE MANAGEMENT, LLC, EASTEX DEER MEADOW, LLC, FLOW LINE TRANSPORTATION, LLC, HALF MOON LAKE, L.L.C., LOCHRIDGE ENERGY SERVICES P&A, LLC, LSC 27 LLC, PHOENIX PETRO SERVICES, LLC, PROTEUS ENERGY LLC, QUARANTINE BAY LLC, RCL PELICAN, RC L S BAY LLC, WIN MANAGEMENT, LLC, WINDWARD CAPITAL ASSETS, AND JOHN DOE DEFENDANTS 1–15, | * * * * * * * * * * * * * * * * * * * * * * * * * | DISTRICT JUDGE BRANDON S. LONG<br><br>MAGISTRATE JUDGE MICHAEL NORTH |
| Defendants. | * | |

---

**FIRST AMENDED ADVERSARY COMPLAINT AND JURY TRIAL DEMAND**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    THE PARTIES............................................................................................ 8

    A.   THE TRUSTEE / PLAINTIFF .................................................................. 8

    B.   THE SEVEN DEBTORS AND THEIR MEMBERS/PARTNERS ...................... 9

    C.   THE OFFICER & DIRECTOR DEFENDANTS................................................. 10

    D.   THE TRUST DEFENDANTS.................................................................... 13

    E.   THE AFFILIATE DEFENDANTS ........................................................... 14

    F.   THE JOHN DOE DEFENDANTS ........................................................... 17

III.   THE COURT'S JURISDICTION AND VENUE ................................. 17

IV.   THE PROCEDURAL HISTORY OF THE BANKRUPTCY CASES ................ 18

V.    FACTUAL BACKGROUND................................................................ 20

    A.   OVERVIEW OF THE BUSINESS OF THE COX ENTERPRISE ..................... 20

    B.   THE LOOTING OF COX OPERATING BY THE DEFENDANTS .................. 24

       a.   The Crespi Estate: ...................................................................... 28

       b.   The Vail Chalet:.......................................................................... 29

       c.   The Lochridge Ranch:................................................................. 32

       d.   The Trust Defendants:................................................................. 32

C.    THE OFFICERS & DIRECTOR DEFENDANTS FAILED TO IMPLEMENT BASIC FINANCIAL CONTROLS FOR THE DEBTORS ................................. 34

D.    THE OFFICER & DIRECTOR DEFENDANTS PERMITTED THE AFFILIATE DEFENDANTS TO IGNORE  THEIR DEBTS AND OTHER OBLIGATIONS TO COX OPERATING ...................................................................................... 35

VI.    THE VENDOR PONZI SCHEME ......................................................................... 38

VII.    A COMPARISON OF LOOTED FUNDS, TRADE DEBT, AND RELATED PARTY RECEIVABLES .................................................................................. 40

VIII.    COX OPERATING WAS INSOLVENT ............................................................. 42

COUNTS ONE THROUGH FORTY-SEVEN…………………………..…………….44-121

JURY DEMAND AND PRAYER FOR RELIEF…………………………..………..123-26

## I.    INTRODUCTION

NOW INTO COURT, through undersigned counsel, comes Michael D. Warner, the duly elected Chapter 7 trustee (the "**Trustee**" or "**Plaintiff**") of the above-captioned Debtors' estates (the "**Debtors' Estates**"), in those certain jointly administered cases under Chapter 7 of the United States Bankruptcy Code styled *In re MLCJR, et al.*, Cas No. 23-90324 (CML) pending before the United States Bankruptcy Court for the Southern District of Texas (the "**Jointly Administered Cases**"), who respectfully submits this First Amended Adversary Complaint and Jury Demand ("**First Amended Complaint**"), in accordance with Federal Rule of Civil Procedure 15(a)(1) because his Original Adversary Complaint and Jury Demand (the "**Adversary Proceeding**") has not yet been served. The Trustee submits this First Amended Complaint for the sole purpose of adding Count 47 to include preference claims against certain insider defendants herein asserted pursuant to 11 U.S.C. § 547. On behalf of the Debtors' Estates, and as Plaintiff in the above-captioned Adversary Proceeding, and against the Defendants,[1] asserts claims, demands, and causes of action seeking recovery of monetary damages arising from Defendants' multiple breaches of fiduciary duties, corporate looting, and multiple fraudulent transfers, and seeking a declaration that the Debtors, the Trust Defendants, the Affiliate Defendants, and Brad Cox, all as defined herein, are alter egos of one another and constitute a single business enterprise, and are solidarily liable for all debts and obligations of the Debtors,[2] and respectfully represents as follows:

---

[1] Capitalized terms used herein are defined below and, for further ease of reference, in the glossary attached hereto as **Exhibit A**.

[2] **The Trustee believes, and represents herein, that this Court may exercise subject matter and personal jurisdiction over each of the Defendants consistent with constitutional and statutory mandates. He further believes, and represents herein, that this Court is a court of proper venue. Nonetheless, in order to ensure he has complied with all deadlines and prescriptive periods and statutes of limitations and repose, the Trustee may file a virtually identical adversary proceeding in the United States Bankruptcy Court for the Southern District**

1

1.    Prior to seeking Chapter 11 bankruptcy protection in May 2023, and likely prior to 2017, the Debtors were victim of truly gross mismanagement and pillaging by insiders on a scale rarely seen in Chapter 11, which is generally designed to provide the opportunity to rightsize the business and undo or otherwise correct historical financial and structural problems. The self-interested, unscrupulous, and uncontrolled management of the Debtors, at the hands of the Defendants, have capsized the Debtors to such an extent that Chapter 11 proved an inadequate mechanism to correct the past wrongs, and the Debtors were forced to convert their Chapter 11 Cases to Chapter 7 Cases,[3] resulting in the election of the Trustee. The Trustee continues to uncover the morass of malfeasance perpetrated by the Defendants and seeks redress by this Civil Action and Adversary Proceeding.

2.    Indeed, *during* the Chapter 11 Cases, the Debtors incurred more than $140 million in additional unsecured debt—a significant portion of which is owed to the same vendors that were owed in excess of $250 million on the Petition Date. That massive unsecured debt is in addition to the more than $200 million owed to the Debtors' Secured Lenders, and the Debtors' obligations owed on surety bonds and for plugging and abandonment liability in excess of $1 billion.

3.    Cox Operating and the other Debtors were at all relevant times dominated and controlled by Brad Cox, Craig Sanders, and Vincent DeVito (the "**Officer & Director Defendants**"). The Officer & Director Defendants' domination and control went unchecked by normal corporate formalities, standard accounting conventions, or compliance with fiduciary duties, and instead proceeded through machinations and transactions designed to foster the

---

**of Texas, Houston Division. Should he do so, the Trustee anticipates that he will likely dismiss one of the two adversary proceedings with prejudice.**

[3] The Conversion of the Debtors' cases from Chapter 11 to Chapter 7 is addressed further below.

overindulgences and lavish lifestyles of Brad Cox, the other Officer & Director Defendants, and Brad Cox's friends and family.

4.      Brad Cox, the other Officer & Director Defendants, and others working at their behest created, managed, and controlled each of the Debtors and a host of other entities residing in an organizational chart (the "**Pyramid of Entities**") both above and below the Debtors.[4] Many of the created entities were either Limited Liability Companies ("**LLCs**") or Limited Partnerships ("**LPs**"), organized and controlled by Brad Cox, the other Officer & Director Defendants, and their confidants, cronies, insiders, and relatives, and other individuals or entities beholden to them. Brad Cox and the other Officer & Director Defendants were conflicted and failed to exercise independent judgment or to act in the interests of Cox Operating and the other Debtors.

5.      At the base of the Pyramid of Entities was Cox Operating L.L.C. ("**Cox Operating**"), which operated (or at least funded) the businesses of the other Debtors, and many of the Non-Debtor Subsidiaries,[5] the Affiliate Defendants, and the Trust Defendants (collectively, with the Officer & Director Defendants, the "**Cox Enterprise**"; the Affiliate Defendants, Trust Defendants, and Officer & Director Defendants are collectively referred to as the "**Cox Enterprise Defendants**").[6] Cox Operating routinely transferred significant assets to many of the Defendants, without receiving equivalent, or, more typically any, value in exchange. The transfers and

---

[4] Attached as **Exhibit B**, hereto is a partial organizational chart filed by the Debtors, at Docket No. 34 (the "**Draft Organizational Chart**"), which Draft Organizational Chart is a work in progress, as it fails to list several additional entities created by some of the Defendants, which entities played a significant role in the disintegration and dissipation of the Debtors' assets prior to the Petition Date, and several such entities are Defendants. All references, unless otherwise stated, to "Docket No. 34" are references to the Bankruptcy Court's Docket maintained in the Jointly Administered Cases, Case No. 23-90324 (CML).

[5] On information and belief there are no fewer than 10 wholly owned non-Debtor subsidiaries of the Debtors ("**Non-Debtor Subsidiaries**"). The Non-Debtor Subsidiaries are not Defendants.

[6] For clarity, Cox Enterprise is not an entity, but rather a conceptual term designed to address the multitude of entities created by the Defendants and used to improperly extract funds from the Debtors.

transactions addressed below demonstrate that Brad Cox and many of the other Defendants treated the Debtors as their piggybank while neglecting and ignoring the most basic fiduciary and corporate duties and the claims of creditors.

6.    The actions of the Cox Enterprise prove that the separate identities of each of the fictitious separate existence of the LLCs, the LPs, and the Trusts, should be disregarded and ignored, and such entities and individuals should be treated as *one single entity* and held liable for the obligations of Cox Operating and the other Debtors.

7.    As of January 1, 2017, Cox Operating was insolvent because the true extent of its liabilities exceeded the fair and true value of its assets. As of that date and through the Petition Date, Cox Operating's assets primarily consisted of related party accounts receivable of dubious value, and which likely had no prospect of being paid and which were largely uncollectable.

8.    As of January 1, 2017, much of Cox Operating's approximate $20 million in trade debts was past due. This would prove a chronic and unsolvable condition for Cox Operating. Through the nearly six-and-a-half years between January 1, 2017, and the Petition Date, Cox Operating consistently incurred debts that it failed to pay, and which the Officer & Director Defendants knew Cox Operating could not pay upon maturation. Cox Operating's dearth of working capital necessary to sustain operations was an endemic condition characteristic of Cox Operating from some time prior to January 1, 2017, through the Petition Date.[7]

9.    During the more than six years preceding the Petition Date, the Defendants used Cox Operating as a personal slush fund and protected their own interests at the expense of Cox

---

[7] As detailed below, some of the Defendants, including the Edwin Trust, guaranteed the working capital needs of Cox Operating and the other Debtors, without follow-through.

Operating. The Officer & Director Defendants routinely ignored and violated their fiduciary duties of loyalty and good faith. The other Defendants aided and abetted the Officer & Director Defendants' breaches of fiduciary duties, and caused the Debtors and their creditors massive damage, including more than $1 billion of unpaid debts.

10.    It need not have been so. Had Cox Operating been managed prudently and competently, had its cash been conserved and spent efficiently (and on debts *actually* owed by Cox Operating), and had the Officer & Director Defendants made any meaningful effort to honor their duties to the Debtors, Cox Operating might well have restructured successfully. But, instead, the Debtors were the victims of widespread self-dealing and looting that inexorably led to their financial implosion and liquidation.

11.    A few illustrations:

- The Officer & Director Defendants (including Brad Cox) awarded Brad Cox compensation of $950,000 each month, in addition to a plethora of other transfers of assets, benefits, and cash.

- Cox Operating made "equity" distributions of more than $180 million to Brad Cox and the other Defendants.

- Cox Operating contributed funds to acquire—and paid for renovation, maintenance, and other expenses of—sprawling luxury homes in Dallas and Athens, Texas, and Vail, Colorado.

- Not content to make a mere $950,000 per month, Brad Cox and his cronies arranged for quarterly distributions to Brad Cox through at least mid-2019—erroneously described as "returns on equity"—in the amount of Brad Cox's federal income tax obligations, despite having no flow-through taxable income.

- Cox Operating directly footed the bill for the lavish lifestyle of Catherine Cox, Brad Cox's wife, including by paying for a luxury vehicle for her personal use, renovations of the couple's various homes, fine wine purchases by the caseload, extravagant entertainment expenses, and extensive domestic and international travel. Catherine Cox expected that Cox Operating would fund any and all of her personal whims (because it typically did), including, for example, $25,000 rugs and

5

a proposed $70,000 child's play structure[8] she wished to install at the *Lochridge Ranch*.

- Brad Cox's lady friend in New Orleans, Louisiana, Jennifer Savoie, had unchecked use of Brad Cox's Cox Oil credit card for lavish personal spending,[9] and received expensive gifts paid for by Cox Operating.[10] Cox Operating also contributed to Jennifer Savoie's living expenses at a luxury condominium on Baronne Street, New Orleans, Louisiana and provided her use of a second luxury condominium (the 1201 Canal Condo) paid for by Cox Operating.[11]

- Helicopters and jet airplanes were routinely used on pleasure trips for Brad Cox, insiders, friends, and family; Cox Operating paid for the costs, maintenance, insurance, and other expenses incurred in connection with these luxury toys, with bills totaling in the hundreds of thousands of dollars. A single excursion to Cabo, Mexico cost Cox Operating more than a $100,000.

- Cox Operating performed extensive personal services for Brad Cox, including, *inter alia*, arranging and paying for his dates with Jennifer Savoie and sending her flowers, driving his dogs from one luxury residence to another, purchasing gifts for his mother, and funding his personal flights and political contributions.

- Transfers from Cox Operating to Affiliate Defendants exceeded $190 million. Cox Operating received little, if any, value in exchange.

12. This Adversary Proceeding addresses these extraordinary breaches of duty and pervasive looting by the Defendants. Cox Operating served as a piggy bank for the Defendants. Cox Operating also routinely provided all Defendants with support staff, accounting functions, resources, and a wide array of non-business services. There was no meaningful separation between Cox Operating and the Defendants. The Defendants routinely treated Cox Operating funds and

---

[8] This estimate did not include labor, installation, or surfacing.

[9] In a March 15, 2021 email, Jennifer Savoie emailed Brad Cox's personal assistant: "Brads [sic] AMEX 4004 is expiring this month. I spoke with Brad and he is cc'd on this email……he asked I email you about getting the new card mailed to me."

[10] By way of example only, Cox Operating paid for a 2017 Christmas gift from Brad Cox to Jennifer Savoie in the form of an approximately $1,300 iPhone.

[11] On August 23, 2023, the Controller of Windward Capital Assets, LLC emailed Brad Cox's personal assistant: "Will you send me Jennifer Savoie's e-mail? I need to get some info from her *since she is living in the NO condo*." (emphasis added).

resources as their own. The separate form of Cox Operating was ignored entirely. Cox Operating and the Defendants functioned as a single pyramid: the Cox Enterprise.

13.    As described more fully herein, Brad Cox and many of the other Defendants organized, designed, and conducted what amounted to a *Vendor Ponzi Scheme*, all with the knowledge, consent, and participation of many of the Defendants. During the same time period during which Brad Cox and the other Officer & Director Defendants caused Cox Operating and the Other Debtors to lose more than $100 million and during which the Debtors incurred and failed to pay a massive amount of debts:[12]

- the Debtors' trade debt, as of the Petition Date, exceeded **$250 million**;

- the Debtors' obligations on surety bonds and for plugging and abandonment exposure exceeded **$1 billion**;

- the Debtors' obligations owed, as of the Petition Date, for taxes and mineral obligations to third parties, exceeded **$68 million**;

- the Debtors' obligations owed, as of the Petition Date, to federal and state entities for unpaid royalty and other obligations related to operations, exceeded **$30 million**;

- the Debtors' unpaid Chapter 11 Administrative Claims, as of Conversion Date, exceeded **$144 million**; and

- the Debtors' unpaid debt of the Debtors' Secured Lenders, as of the date the Chapter 11 cases were converted to Chapter 7, exceeded **$200 million** and was in default.

14.    Louisiana vendors were exceptionally hard hit. Cox Operating's filing in the Chapter 11 cases detailed a *minimum* of 241 Louisiana creditors with approximately **$150 million**.

---

[12] The amounts provided below are the Debtors' estimates, and not the Trustee's, and do not address obligations owed by Non-Debtor Subsidiaries. *See In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket Nos. 476, 477, 478, 479, 480, 481, and 482.

The Trustee believes the total numbers of Louisiana creditors, and amounts owed to them, are even higher.

15.     By this Adversary Proceeding, the Trustee seeks redress for these harms, including through claims to: (i) recover damages for the Defendants' negligence, gross negligence, bad faith and repeated breaches of fiduciary duties, including the duty of loyalty, duty of good faith and fair dealing, and for aiding and abetting these breaches of fiduciary duties; and (ii) recover transfers made by Cox Operating and the other Debtors that constitute fraudulent transfers or illegal dividends and distributions under applicable law.

## II.   THE PARTIES[13]

### A.   THE TRUSTEE / PLAINTIFF

16.     On May 8, 2024, Michael D. Warner was qualified as the duly elected Chapter 7 Trustee of each of the Jointly Administered Cases, and he remains Trustee as of the date hereof, of each of the Debtor's Estates.[14]

17.     The Trustee is the Plaintiff in this Adversary Proceeding and brings this action on behalf of the Debtors' Estates.

18.     The Trustee is vested with, among other things, the powers described in section 704 of the Bankruptcy Code, including the power to investigate the financial affairs of the Debtors, and to collect and reduce to money property of the Debtors' Estates.

---

[13] For ease of initial identification of the Parties, the Defendant parties are identified in **RED**, in Section II, hereof, only.

[14] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket Nos. 1919 and 1996.

**B.      THE SEVEN DEBTORS AND THEIR MEMBERS/PARTNERS**

19.      Debtor MLCJR LLC, a Texas limited liability company ("**MLCJR**"),[15] was the first Debtor to file its Chapter 11 Petition, and thus identified by the Bankruptcy Court to be the Docket in which all subsequently filed pleadings in the Jointly Administered Cases are to be filed. The members of MLCJR are: (i) WIN Management LLC; (ii) Cox Investment Partners, LP; and (iii) CLS Development, LLC.

20.      Debtor M21K, LLC, a Texas limited liability company ("**M21K**") whose sole member is MLCJR. Its case under Title 11, first under Chapter 11 and now under Chapter 7, is one of the Jointly Administered Cases. *See In re M21K, LLC*, Case No. 23-90325 (Bankr. S.D. Tex.).

21.      Debtor EPL Oil & Gas LLC, a Delaware limited liability company ("**EPL O&G**") whose sole member is MLCJR. Its case under Title 11, first under Chapter 11 and now under Chapter 7, is one of the Jointly Administered Cases. *See In re EPL Oil & Gas, LLC*, Case No. 23-90326 (Bankr. S.D. Tex.).

22.      Debtor Energy XXI Gulf Coast LLC, a Delaware limited liability company ("**Gulf Coast**") whose sole member is CEXXI LLC, also a Delaware limited liability company. Gulf Coast's case under Title 11, first under Chapter 11 and now under Chapter 7, is one of the Jointly Administered Cases. *See In re Energy XXI Gulf Coast, LLC*, Case No. 23-90329 (Bankr. S.D. Tex.).

23.      Debtor Energy XXI GOM LLC, a Delaware limited liability company ("**Energy XXI**") whose sole member is Gulf Coast. Its case under Title 11—first under Chapter 11 and now

---

[15] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.).

under Chapter 7—is one of the Jointly Administered Cases. *See In re Energy XXI GOM, LLC*, Case No. 23-90330 (Bankr. S.D. Tex.).

24.    Debtor Cox Operating L.L.C. ("**Cox Operating**") a Louisiana limited liability company whose sole member is Phoenix Petro Services LLC. The sole member of Phoenix is Cox Investment Partners, LP. Its case under Title 11, first under Chapter 11 and now under Chapter 7, is one of the Jointly Administered Cases. *See In re Cox Operating, L.L.C.*, Case No. 23-90327 (Bankr. S.D. Tex.).

25.    Debtor Cox Oil Offshore, L.L.C., a Louisiana limited liability company ("**Offshore**") whose sole member is MLCJR. At founding, Offshore's sole officer was Craig Sanders, its manager and secretary was Brad Cox, and its sole member was Phoenix Petro Services LLC. William Graham is a director of Offshore. Offshore's case under Title 11, first under Chapter 11 and now under Chapter 7, is one of the Jointly Administered Cases. *See In re Cox Oil Offshore, L.L.C.*, Case No. 23-90328 (Bankr. S.D. Tex.).

26.    Debtors MLCJR, M21K, EPL O&G, Gulf Coast, Energy XXI, Cox Operating, and Offshore are collectively referred to as the "**Debtors**."

C.    **THE OFFICER & DIRECTOR DEFENDANTS**

27.    Defendant Brad E. Cox ("**Brad Cox**"), an individual of the age of majority and a resident of the State of Texas. Brad Cox is deemed a citizen of the state in which he resides. At all relevant times, Brad Cox was Chairman of the Board of Cox Operating. He was also Chairman of each of the Affiliate Defendants. On information and belief, Brad Cox is a resident of at least two luxury properties within the State of Texas, and a luxury property in Vail, Colorado, to wit:

- The **Crespi Estate** in Dallas, Texas, touted as "the priciest home in Texas," being recently listed at $64 million, and which has been described as including a 27,092-square-foot main house with 10 bedrooms, 12½ bathrooms, a private elevator, and

a safe room; a three-story, 4,800-square-foot entertainment pavilion with a 19-seat theater; a two-story, 3,300-square-foot guest house; a fully equipped gym with on-site cryotherapy as well as a massage room, steam room, and sensory deprivation tank; and extensive grounds that include a heliport, greenhouse, tennis court, country club-size pool, and a waterfall.[16] The Crespi Estate is owned by the Charlee Lochridge Cox Dynasty Trust. The Crespi Estate:



- The **Lochridge Ranch**, an approximately 15,000-acre ranch in Athens, Texas, within Henderson and Anderson Counties, Texas, which includes multiple residences and an airport.[17] The various parcels comprising the Lochridge Ranch are owned by Eastex Deer Meadow LLC and other related entities. The Lochridge Ranch:



---

[16] https://www.realtor.com/news/unique-homes/60m-crespi-estate-in-dallas-tx-is-the-states-most-expensive-home/; https://www.youtube.com/watch?v=u2HPqNDjb38.

[17] https://www.youtube.com/watch?v=khy3ze4RKDQ.

- The **Vail Chalet**, a 6,000+ square foot $36 million home in Vail, Colorado boasts 9 bedrooms, 9 bathrooms, a private elevator, and its own private funicular providing access from the ski chalet to the pool house.[18] Public records for Eagle County, Colorado evidence that Defendant LSC 27, LLC is the record owner of the Vail Chalet. Internal Cox Operating documents indicate LSC 27, LLC may have privately conveyed title to Defendant Charlee Lochridge Cox Dynasty Trust. The Vail Chalet is thus owned either by LSC 27, LLC or the Charlee Lochridge Cox Dynasty Trust. The Vail Chalet:



28.    Defendant Craig Sanders ("**Sanders**"), an individual of the age of majority and a resident of the State of Texas. Sanders is deemed a citizen of the state in which he resides. At all relevant times, Sanders has been the President and Chief Executive Officer of Cox Operating and each of the Debtors, and the President and Chief Executive Officer of each of the Affiliate Defendants. In his capacity as a director and officer of the various Debtors and Affiliate Defendants, Sanders has conducted extensive operations and transactions in both Louisiana and Texas.

29.    Defendant Vincent DeVito ("**DeVito**"), an individual of the age of majority and a resident of the State of Virginia. DeVito is deemed a citizen of the state in which he resides. At all

---

[18] https://www.youtube.com/watch?v=O0ZSLihrQCY.

relevant times, DeVito was the General Counsel and Executive Vice President of Cox Operating, each of the Debtors, and each the Affiliate Defendants. In his capacity as a director and officer of the various Debtors and Affiliate Defendants, DeVito has conducted extensive operations and transactions in both Louisiana and Texas.

30.    Defendants Brad Cox, Sanders and DeVito are collectively referred to as the "**Officer & Director Defendants**."

**D.    THE TRUST DEFENDANTS**

31.    Defendant the Arden Trust company, in its capacity as the duly appointed and acting trustee of the Bradley Edwin Cox Trust (the "**Bradley Trust**"), a trust organized and existing under the laws of the State of Texas. The sole beneficiary of the Bradley Trust is Brad Cox.

32.    Defendants Craig Sanders and William Graham, in their capacities as co-trustees of the Charlee Lochridge Cox Dynasty Trust (the "**Dynasty Trust**"), a trust organized and existing under the laws of the State of Texas.[19] The sole beneficiary of the Dynasty Trust is the minor child of Brad Cox and Catherine Cox ("**CLC**").

33.    Defendant William Graham, in his capacity as the trustee of the Edwin L. Cox "B" Trust (the "**Edwin Trust**"), a trust organized and existing under the laws of the State of Texas. The Edwin Trust is the sole member of Cox Oil LLC, Cox Management Dallas LLC, and Eastex Deer Meadow LLC. The sole beneficiary of the Edwin Trust is Brad Cox.

34.    Defendants Bradley Trust, Dynasty Trust, and Edwin Trust are collectively referred to herein as the "**Trust Defendants**."

---

[19] As noted, *supra*, the Dynasty Trust owns the *Crespi Estate* and may have an ownership interest in the *Vail Chalet*.

E.    **THE AFFILIATE DEFENDANTS**

35.    Defendant CLS Development, LLC ("**CLS Development**"), a limited liability company organized and existing under the laws of the State of Texas. CLS Development is registered to do and is in fact doing business in the State of Louisiana. CLS Development is a member of MLCJR, having a 5.987% interest therein. Sanders is the manager of CLS Development.

36.    Defendant Cox Interests, LLC ("**Cox Interests**"), a limited liability company organized and existing under the laws of the State of Louisiana. Cox Interests is a wholly owned subsidiary of Cox Oil LLC.

37.    Defendant Cox Investment Partners, LP ("**CIP**"), a limited partnership organized and existing under the laws of the State of Delaware. Brad Cox is the sole limited partner of CIP.

38.    Defendant Cox Gathering LLC ("**Gathering**"), a limited liability company organized and existing under the laws of the State of Louisiana. Gathering is a wholly owned subsidiary of Cox Operating and is registered to do and is in fact doing business in the State of Louisiana.

39.    Defendant Cox Management Dallas LLC ("**Cox Management**"), a limited liability company organized and existing under the laws of the State Delaware. Brad Cox and the Edwin Trust are the members of Cox Management, and Sanders is its manager.

40.    Defendant Cox Oil and Gas LLC ("**Cox Oil & Gas**"), a limited liability company organized and existing under the laws of the State of Texas.

41.    Defendant Cox Oil LLC ("**Cox Oil**"), a limited liability company organized and existing under the laws of the State of Delaware. At all times relevant to this Adversary Proceeding, Cox Oil was registered to and was in fact doing business in the State of Louisiana. Cox Oil is the

14

parent company of Proteus Energy LLC, Cox Interests, and Cox Oil & Gas. Cox Oil is a wholly owned subsidiary of the Edwin Trust.

42.    Defendant CW Facilities LLC ("**CW Facilities**"), a limited liability company organized and existing under the laws of the State of Delaware. CW Facilities is a wholly owned subsidiary of CIP.

43.    Defendant Dallas Estate Management LLC ("**Estate Management**"), a limited liability company organized and existing under the laws of the State of Texas.

44.    Defendant Eastex Deer Meadow LLC ("**Eastex**"), a limited liability company organized and existing under the laws of the State of Texas. Brad Cox, Sanders, and DeVito are the officers of Eastex, and Williams Graham (one of the trustees of the Dynasty Trust and the sole trustee of the Edwin Trust) is a member. The sole member of Eastex is the Edwin Trust. Eastex owns portions of the property comprising the Lochridge Ranch.

45.    Defendant Flow Line Transportation LLC ("**Flow Line**"), a limited liability company organized and existing under the laws of the State of Louisiana. Flow Line is a subsidiary of Phoenix Petro Services LLC.

46.    Defendant Half Moon Lake, L.L.C. ("**Half Moon**"), a limited liability company organized and existing under the laws of the State of Louisiana. Half Moon's sole officer is William Graham.

47.    Defendant Lochridge Energy Services P&A, LLC ("**Lochridge P&A**"), a limited liability company organized and existing under the laws of the State of Louisiana.

48.    Defendant LSC 27 LLC ("**LSC**"), a limited liability company organized and existing under the laws of the State of Texas.

15

49.     Defendant Phoenix Petro Services LLC ("**Phoenix**"), a limited liability company organized and existing under the laws of the State of Delaware. Sanders is the sole manager, and CIP is the sole member of Phoenix. Previously, and at certain times relevant to the allegations herein, Brad Cox served as the secretary and manager of Phoenix.

50.     Defendant Proteus Energy LLC ("**Proteus**"), a limited liability company organized and existing under the laws of the State of Delaware. Proteus is a wholly owned subsidiary of Cox Oil.

51.     Defendant Quarantine Bay LLC ("**Quarantine Bay**"), a limited liability company organized and existing under the laws of the State of Louisiana.

52.     Defendant ("**RCL Pelican**"), an entity controlled by Brad Cox that received transfers from Cox Operating. At this time, the Trustee has not yet determined whether RCL Pelican was legally formed, and if so, under the laws of which State.

53.     Defendant RC L S Bay LLC ("**RC L S Bay**"), an entity controlled by Brad Cox that received transfers from Cox Operating. At this time, the Trustee has not yet determined whether RC L S Bay was legally formed, and if so, under the laws of which State.

54.     Defendant WIN Management LLC ("**WIN**"), a limited liability company organized and existing under the laws of the State of Delaware. WIN is a member of MLCJR, having a 24.79127% interest therein. It is managed by William Graham, and its members include, *inter alia*, CIP, Kathleen Cox (Brad Cox's mother), and the Dynasty Trust.

55.     Defendants Windward Capital Assets LLC ("**Windward**"), a limited liability company organized and existing under the laws of the State of Delaware.

56.     Defendants CLS Development, Cox Interests, CIP, Gathering, Cox Management, Cox Oil & Gas, Cox Oil, CW Facilities, Estate Management, Eastex, Flow Line, Half Moon,

16

Lochridge P&A, LSC, Phoenix, Proteus, Quarantine Bay, RCL Pelican, RC L S Bay, WIN, and Windward are collectively referred to herein as the "**Affiliate Defendants**."

**F.    THE JOHN DOE DEFENDANTS**

57.    The Trustee has attempted to identify all persons and entities who either (i) aided and abetted the breach of fiduciary and other legal duties by the Officer & Director Defendants or (ii) received from Cox Operating, directly or indirectly, transfers, avoidable under federal or state law, and which are affiliated with another Defendant. The Trustee, however, recognizes that all such persons and entities may not be known to him at this time and that he may not have identified all transfers to such persons. Of course, the identity of such persons, assuming one or more exists, and the transfers to each, should be known to one or more of the Officer & Director Defendants or other Defendants. The Trustee adds as additional defendants John Doe(s) 1–15 (collectively, the "**John Doe Defendants**").

58.    The Officer & Director Defendants, the Trust Defendants, the Affiliate Defendants, and the John Doe Defendants are collectively referred to herein as the "**Defendants**."

### III.   THE COURT'S JURISDICTION AND VENUE

59.    This action arises under and relates to the Debtors' Jointly Administered Cases and is a core and non-core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (H), and (O). The This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, because the claims, demands, and causes of action asserted herein arise under the Bankruptcy Code or relate to the Jointly Administered Cases.

60.    Venue in this district is proper pursuant to 28 U.S.C. § 1409(c). A substantial part of the events or omissions giving rise to this Adversary Proceeding occurred in this district.

17

61.     This Court may exercise personal jurisdiction over each of the Defendants because each Defendant is either a citizen of this state, or has such minimum contacts with this state that related directly to the claims asserted against him or it, that personal jurisdiction may be exercised consistent with the United States Constitution. Further, this Court may assert personal jurisdiction pursuant to 28 U.S.C. § 1334 and effectuate nationwide service of process pursuant Bankruptcy Rule 7004.

### IV.    THE PROCEDURAL HISTORY OF THE BANKRUPTCY CASES

62.     On May 12, 2023, four trade creditors—having had enough of Cox Operating's use and abuse of their services, products, and credit—filed an involuntary petition (the "**Involuntary Petition**") under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Louisiana (the "**Louisiana Bankruptcy Case**" and the "**Louisiana Bankruptcy Court**," respectively).[20] On May 13, 2023, a fifth trade creditor joined the Involuntary Petition.[21] Collectively, the five creditors asserted claims in excess of $2.85 million.

63.     On May 14, 2023 (the "**Petition Date**"), Cox Operating and six affiliates—the Debtors—each filed voluntary petitions under Chapter 11 of the Bankruptcy Code (collectively, the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

64.     On May 16, 2023, the Bankruptcy Cases were consolidated for joint administration under the caption *In Re: MLCJR LLC, et al.*, Case No. 23-90324 (CML) by the Bankruptcy Court (collectively, the "**Jointly Administered Cases**").[22]

---

[20] Louisiana Bankruptcy Case, Docket No. 1.

[21] Louisiana Bankruptcy Case, Docket No. 3.

[22] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 103.

65.    On May 23, 2023, notwithstanding its conclusion that the Louisiana Bankruptcy Court was a proper venue for the Louisiana Bankruptcy Case,[23] the Louisiana Bankruptcy Court issued a *Memorandum Opinion and Order* in which it ordered the Clerk of the Louisiana Bankruptcy Court to "transfer the above-captioned involuntary bankruptcy case to the United States Bankruptcy Court for the Southern District of Texas."[24]  On June 28, 2023, the Bankruptcy Court dismissed the Involuntary Case.[25]

66.    On February 20, 2024, the Debtors filed their *Emergency Motion (I) to Convert Chapter 11 Cases to Cases Under Chapter 7, etc.* (the "**Conversion Motion**").[26]  As relevant herein, the Debtors stated in the Conversion Motion that, "[a]s of February 14, 2024, the Debtors consummated sales of substantially all of their producing assets."[27]

67.    On February 28, 2024 (the "**Conversion Date**"), the Conversion Motion was granted by the Bankruptcy Court.[28]

68.    On May 6, 2024, the Bankruptcy Court entered the *Agreed Order Resolving Disputed Election of Trustee, etc.*, in which it was ordered, *inter alia*, that, "[a]s a result of the trustee election[,] Michael D. Warner shall be the permanent Chapter 7 trustee in these Cases, subject to Mr. Warner's ability to qualify under 11 U.S.C. § 322(a)."[29]

---

[23] Louisiana Bankruptcy Case, Docket No. 73, p. 5.

[24] Louisiana Bankruptcy Case, Docket No. 73, p. 15.

[25] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 526.

[26] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 1661.

[27] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 1661, ¶ 15.

[28] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 1720.

[29] *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 1919, p. 3.

69.     On May 8, 2024, Michael D. Warner filed his *Notice of Bond and Acceptance of Election*.[30]  As of May 8, 2024, Mr. Warner became the permanent Chapter 7 Trustee of each of the Debtors' Estates, and he remains Trustee as of the date hereof.

## V.    FACTUAL BACKGROUND[31]

### A.    OVERVIEW OF THE BUSINESS OF THE COX ENTERPRISE

70.     Cox Operating and certain affiliates[32] were established in 2003 to secure oil and gas leases and operate producing oil and gas wells located in Louisiana State waters and the Gulf of Mexico Outer Continental Shelf, primarily adjacent to the State of Louisiana.[33] Cox Operating and certain affiliates commenced operations in 2004. Over the following twenty years, the Cox Enterprise (consisting of Cox Operating and the other Debtors, the Officer & Director Defendants, the Trust Defendants, the Affiliate Defendants, and others in the control of the corporate entities)

---

[30] Docket No. 1996.

[31] A portion of the historical background of the Cox Enterprise set forth herein is based upon the *Declaration of Ryan Omohundro, Chief Restructuring Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Omohundro Declaration**") and thus is subject to correction as further information is uncovered.  *In re MLCJR, et al.*, Case No. 23-90324 (CML) (Bankr. S.D. Tex.), Docket No. 34.

[32] The generic phrases "certain affiliates" and "affiliates" are intended to refer generally to one or more of the Debtors, the Non-Debtor Subsidiaries, and/or Affiliate Defendants. Where specificity is known or required, it will be provided.

[33] Federal leases for offshore exploration and development are addressed by various Federal entities, to wit: the United States Department of the Interior, which includes without limitation the Bureau of Ocean Energy Management ("**BOEM**"), the Bureau of Safety and Environmental Enforcement ("**BSEE**"), and the Office of Natural Resources Revenue ("**ONRR**"). BOEM was created to manage development of the Outer Continental Shelf (the "**OCS**") energy and mineral resources in an environmentally and economically responsible way. BOEM is responsible for stewardship of U.S. OCS energy and mineral resources, as well as protecting the environment that the development of those resources may impact. BSEE promotes safety, protects the environment, and conserves resources offshore through vigorous regulatory oversight and enforcement. ONRR collects, accounts for, and verifies natural resource and energy revenues due to states, American Indians, and the U.S. Treasury. ONRR collects the Royalty Obligations due by the lessee of Fields within Blocks. A "Block" is a designated area in a body of water for mineral exploration. The Gulf of Mexico is divided into named Blocks. Block sizes are never more than 5,760 acres. Within a Block are "Fields." Fields may be leased to third parties to explore and develop mineral reserves—and in this case were part of the business of Cox Operating and certain affiliates.

grew—on the backs of creditors—into one of the largest privately owned operators of producing oil and gas wells in the Gulf of Mexico.

71. From 2005 through 2013, the Cox Enterprise acquired interests in the Gulf of Mexico, including Fields adjacent to Louisiana State waters designated as Quarantine Bay, Elois Bay, and Half Moon Lake Bay. Beginning in 2016, Cox Operating and the other Debtors executed a series of major asset acquisitions including of: (a) Chevron's Gulf of Mexico assets; (b) Freeport McMoran's Gulf of Mexico assets; (c) Gulf Coast's Gulf of Mexico assets; and (d) Quarter North's interest in certain Gulf of Mexico Fields.

72. As detailed below, as a result of Cox Enterprise's acquisition of Energy XXI, MLCJR emerged as the surviving entity.

73. Cox Operating served as the operator for oil and gas wells and related structures owned by the entities within the Cox Enterprise.[34] As of the Petition Date, "[t]he Debtors operate[d] the majority of their over 750 wells across 470 structures in 60 fields in the waters spanning from Texas to Alabama."[35] Cox Operating was responsible for securing all goods and services required for the production, operation, and maintenance of the wells, leases, pipelines, platforms, and the like, and incurred all operating expenses and held all liabilities relating to the same. In theory, Cox Operating was to be paid a fee for all such services and reimbursed by the other entities within the Cox Enterprise for the expenses paid by Cox Operating. In practice, the fees were seldom paid—and if paid, were designed to shuffle funds within the Cox Enterprise for the ultimate benefit of the Defendants. Amounts owed to Cox Operating by the other entities within

---

[34] All business operations of the Debtors and the provision of services, management or otherwise by Cox Operating to the Cox Enterprise, ceased, at least as of the Conversion Date, if not sooner.

[35] Omohundro Declaration, ¶ 29.

the Cox Enterprise for lease operating expenses were booked as related party accounts receivable ("**Related Party Receivables**"). In 2017 and thereafter, the Related Party Receivables were either paid late or not paid at all, and either always were or eventually became worthless.

74.    Cox Operating listed its headquarters as an office in Dallas, Texas. In fact, the day-to-day operations of Cox Operating were conducted from its real operational headquarters, located in New Orleans, Louisiana (the "**New Orleans Headquarters**"), until shortly before the Petition Date, when the operational headquarters moved to Jefferson Parish, Louisiana.

75.    The New Orleans Headquarters was the operational center of Cox Operating (and the Cox Enterprise), as it managed, controlled, and operated the assets of the entire Cox Enterprise. The New Orleans Headquarters included the Cox Operating accounting department, operations department, human resources department, engineering department, and geological and geophysical department. The functions of each of these departments were performed by employees of Cox Operating. None of the other members of the Cox Enterprise had any of their own operational employees.

76.    Cox Operating provided all necessary operational, administrative, and financial services for all operating assets (wells, federal and state leases, pipelines, platforms, etc.) for the entire Cox Enterprise. Specifically, and by way of illustration only, the services Cox Operating provided the entire Cox Enterprise included:

  a. performing all duties related to operating and maintaining oil and gas wells, including: (i) negotiating, executing, and performing all agreements with trade vendors contracted to operate, maintain, or otherwise service the wells; (ii) negotiating, executing, and performing all agreements that allowed for or related to the exploration and development of the wells; and (iii) negotiating and managing federal and state leases;

  b. undertaking any reworking, recompleting, deepening, plugging back, and sidetracking with respect to the wells;

c.    negotiating the sales of all hydrocarbons produced from the wells and managing the revenue obtained therefrom;

d.    preparing, reviewing, and delivering joint interest billing statements for all operations and maintenance of the wells;

e.    taking bids and negotiating contracts with various trade vendors providing services for the operation and maintenance of the wells and the related platforms;

f.    preparation, review, and authorization of expenditures required for any operations on or related to the wells;

g.    supervising all work performed for the wells;

h.    performing regulatory compliance and preparing and submitting required governmental filings for all operations for the wells;

i.    preparing and implementing asset management plans, annual budgets, annual work programs, acquisition and divesture analyses, plugging and abandoning capital analyses, and meetings and conferences with third-party non-operators and governmental authorities;

j.    supervising all work related to the plugging and abandoning of any well; and

k.    general and administrative services including accounting, risk management, and human resources.

77.    Starting no later than 2017,[36] Cox Operating's financial position became alarmingly precarious. In early 2017, Related Party Receivables exceeded $41 million; over the following six years, Related Party Receivables grew to more than $100 million and were wholly worthless. Over the same period, Cox Operating's debts—legitimately owed to true third parties (vendors and lenders)—exploded. Further details regarding both the Related Party Receivables and outstanding vendor debts are detailed below.

---

[36] To date, the Trustee has limited his forensic financial analysis of Cox Operating to the period of January 1, 2017 through the Petition Date, though he expects to uncover additional illegitimate transfers predating that timeframe.

78.     The other participants in the Cox Enterprise did not pay their respective debts to Cox Operating, and default in the payment of those debts was a significant factor in the Debtors' monumental financial failure.

79.     Cox Operating would have withstood the Cox Enterprise's failure to pay Related Party Receivables and other obligations if Cox Operating had not been looted at the hands of Defendants to support their own—and their cronies', families' and insiders'—lavish lifestyles. As detailed below, between January 1, 2017, and the Petition Date, they collectively pillaged more than $180 million of Cox Operating's funds.

**B.      THE LOOTING OF COX OPERATING BY THE DEFENDANTS**

80.     **By Brad Cox:** Between January 1, 2017, and the eve of the Petition Date, Brad Cox received an annual base salary from Cox Operating of $11.7 million, i.e., $950,000 per month. This *base salary* was just a small portion of the illegitimate transfers made to Brad Cox. Remarkably, the additional funds Brad Cox extracted from Cox Operating far surpassed his exorbitant salary and included the following:

a.      On a quarterly basis, through at least mid-2019, funds were transferred by Cox Operating to Phoenix to CIP and falsely classified—booked on the records of Cox Operating—as a "return of equity" distribution. These distributions were to cover Brad Cox's quarterly installments of his Federal Income Tax, resulting in Cox Operating paying both Brad Cox's exorbitant salary and the income taxes on that inflated salary.

b.      Cox Operating paid hundreds of thousands of dollars for Brad Cox's entertainment and travel expenses, which had nothing to do with Cox Operating's legitimate business. A single Brad Cox weekend getaway to Cabo, Mexico cost Cox Operating some $100,000. A single Brad Cox flight to Vail for "house remodel and

24

inspection" cost Cox Operating $22,000. And a single flight to Romania to pursue an elusive and obviously impracticable business transaction—at a time when Cox Operating was bleeding money and unable to pay its legitimate due and owing debts—cost Cox Operating $149,000.

c.     Cox Operating, directly or indirectly, paid Brad Cox's credit card bills, including the personal expenses incurred by his New Orleans lady friend, Jennifer Savoie, on Brad Cox's Cox Oil credit card.

d.     Cox Operating funded Catherine Cox's extravagant lifestyle, including luxury vehicles, extensive high-end home renovations and furnishings, and exorbitant travel and entertainment expenses.

e.     Cox Operating also contributed heavily to Jennifer Savoie's lavish lifestyle, not only by providing her unlimited use of Brad Cox's Cox Oil credit card but also by contributing to her rent and other expenses at a private luxury condominium in downtown New Orleans and then later permitting her to use the 1201 Canal Condo, as defined below, which was owned by the Edwin Trust and for which expenses were paid by Cox Operating. Improper transfers from Cox Operating to the Edwin Trust included payments of $5,500 a month for "rent" for the 1201 Canal Condo pursuant to yet another bogus lease between Cox Operating and an Affiliate Defendant.

f.     As identified *supra*, Brad and Catherine Cox share three principal residences: (i) the Crespi Estate; (ii) the Lochridge Ranch; and (iii) the Vail Chalet. Cox Operating paid through various intermediaries to purchase the Crespi Estate and Vail Chalet. It may have also provided funds to purchase at least a portion of the Lochridge Ranch. Cox Operating regularly paid for, either directly or through transfers to various

25

Defendants, funds for travel to and renovations, maintenance, and other expenses for each of the residences.

g.  Multiple helicopters and jet airplanes were owned or leased by entities within the Cox Enterprise, with the costs of maintenance, insurance, service, pilots, and the like routinely paid for by Cox Operating, notwithstanding the use of such aircraft for extensive non-business travel, including pleasure trips for Brad Cox, his family, friends, and cronies. For example, Cox Operating "leased" a private jet from its affiliate Proteus—with a Cox Operating logo on its tail, as shown below—for $300,000 *per month*:



81.  **Unlawful distributions to Brad Cox, Phoenix, CIP, CLS Development, and WIN**: Between January 1, 2017, and the Petition Date, none of the Debtors had sufficient net revenues to permit lawful equity distributions to their respective members—Phoenix, CIP, CLS Development, and WIN. Nonetheless, Cox Operating made distributions to those entities totaling more than $93 Million. A significant portion of these funds were paid directly to Brad Cox, or otherwise ultimately ended up in Brad Cox's hands.

82.  **Distributions by Cox Operating to Phoenix** led right back to Brad Cox. As noted, *supra*, the equity ownership of Cox Operating is:

    a.      Cox Operating's sole member is Phoenix;

    b.      Phoenix's sole member is CIP;

    c.      the General Partner of CIP is Cox Management; and

    d.      the sole Limited Partner of CIP was Brad Cox.

83.     Distributions by **Cox Operating to CIP**, likewise, led right back to Brad Cox. As noted, *supra*, the equity ownership of CIP is:

    a.      the General Partner of CIP is Cox Management; and

    b.      the Sole Limited Partner of CIP is Brad Cox.

84.     Distributions by **Cox Operating to Cox Management**, likewise, led right back to Brad Cox. As noted, *supra*, the equity ownership structure Cox Management is:

    a.      the Members Cox Management are Brad Cox and the Edwin Trust.

85.     Distributions by **Cox Operating to MLCJR**, likewise, led right back to Brad Cox. As noted, *supra*, the equity ownership of MLCJR is:

    a.      The Members of MLCJR are WIN, CIP and CLS Development;

        i.      CLS Development holds a 5.987% interest in MLCJR;

        ii.     CIP holds a 69.25% interest in MLCJR;

             *a.*    The General Partner of CIP is Cox Management; and

             *b.*    The Sole Limited Partner of CIP is Brad Cox.

        iii.    WIN holds a 24.79127% interest in MLCJR;

             *a.*    WIN is a subsidiary of CIP.

86.     Cox Operating was insolvent by multiple standards from January 1, 2017, through the Petition Date and it could not lawfully make distributions, returns of equity, or dividends on equity. Nevertheless, Cox Operating distributed at least $44.5 million to Phoenix, which in turn

distributed all or a part of the funds to or on behalf of Defendants CIP, Brad Cox, and the Edwin Trust.

87.     Between January 1, 2017, and the Petition Date, Cox Operating also made distributions to the holders of the membership interests in MLCJR including, to: (a) CIP of at least $35 million; (b) WIN of at least $11 million; and (c) CLS Development of at least $2.5 million. It is understood that all or a portion of those funds were ultimately transferred to Brad Cox or the Edwin Trust. Cox Operating received no benefit or consideration for these distributions, which totaled no less than $48.5 million.

88.     **Transfers to or for the benefit of the *Crespi Estate*, the *Vail Chalet*, *Lochridge Ranch*, and the Trust Defendants*:***

        a.     **The Crespi Estate:**

            i.     The Crespi Estate was purchased in 2019 in the name of the Dynasty Trust with a loan of $29 million financed by UBS. The downpayment for the purchase of the Crespi Estate was approximately $12.5 million and paid through a series of "funneling exercises" among the entities in the Cox Enterprise. Specifically, MLCJR took the $12.5 million down payment from its line of credit and transferred it to Cox Offshore, which then transferred the funds to Cox Operating, which then transferred the funds to Phoenix, which then transferred the funds to CIP, which then transferred the funds to the lender, UBS. Many of these transfers occurred in a matter of an hour or two. This transaction was ultimately characterized as a note receivable on Cox Operating's books, with corresponding note payables to Cox Operating of $7.85 million from CIP and $4.65 million from

Phoenix (totaling $12.5 million). The series of wire transfers involved in these funneling exercises were both requested and authorized by Sanders.

    ii.    In 2021, the Crespi Estate was appraised for $31 million, and the Dynasty Trust obtained a $30.4 million loan from the Royal Bank of Canada in return for a First Recorded Deed of Trust encumbering the Crespi Estate.

    iii.    In 2025, the Crespi Estate was listed for sale at a price of $64 million.

**b.**    **The Vail Chalet:**

    i.    The Vail Chalet has been valued at over $36 million. The Vail Chalet was purchased in the name of LSC for $9.25 million. The down payment, monthly mortgage payment, and cost of renovations, maintenance, operations, and upkeep of the Vail Chalet were paid, directly or indirectly, by Cox Operating.

    ii.    Prior to the purchase of the Vail Chalet, Cox Operating previously funded the cost, acquisition, and upkeep for a Vail condominium (the "**Vail Condo**"). The Vail Condo was acquired in 2014 by LSC for $3.25 million. In 2017, LSC sold the Vail Condo for $4 million, and the net proceeds were applied to the downpayment of the Vail Chalet, which was acquired in September 2018. There was a deficiency of approximately $3.4 million between the net proceeds from the sale of the Vail Condo and the downpayment for the Vail Chalet. In order to fund the purchase of the Vail Chalet, Cox Operating and Sanders engaged in a series of transactions intended to camouflage the true source of payments and improperly "prove" funds. First, on August 13, 2018, Sanders specifically authorized and directed a series of wires transfers to fund the Vail Chalet's deposit. Sanders wired

$1 million from the Cox Operating checking account to the Phoenix account; then on the same day, wired that same $1 million from Phoenix to CIP, and $500,000 from CIP to LSC. Also, that same day, Sanders emailed another Cox Operating employee to direct her to wire the $450,000 in earnest money to the bank for the Vail Chalet purchase. Sanders described these several transfers as "overhead payments." As closing approached, on or about September 13, 2018, Sanders directed a series of transactions through MLCJR, Offshore, Cox Operating, Phoenix, CIP and LSC to improperly "prove funds" to the Bank in the amount of $3,750,000. These initial transactions were all reversed on the same day, with no net cash changes.[37] Eight days later, on September 21, 2018, Sanders again directed that $3,750,000 be funneled to LSC, which ultimately used those funds to pay approximately $3.4 million in down payment and/or closing costs to purchase the Vail Chalet. This time the funds improperly moved from MLCJR to Offshore to Cox Operating (an old account) (the "**Legacy Account**")[38] to Phoenix to CIP to LSC. This was classified on Phoenix and LSC's books as a distribution.

iii.    During or immediately following the closing of the purchase of the Vail Chalet in the name of LSC, Sanders caused LSC and Cox Operating to execute a bogus lease for the Vail Chalet (the "**Vail Lease**"). The Vail Lease provided, *inter*

---

[37] Sanders printed out the bank statement for LSC showing the funds and sent it to the bank, despite routing funds out the same day.

[38] On September 27, 2018, Sanders attempted to "fix" the September 21, 2018 transactions—because employees were questioning why Offshore was directly paying the Legacy Account—by posting a "no cash effect" entry to transfer $3.75 million from the Legacy Account to Offshore, and then sending those funds from Offshore to Cox Operating to the Legacy Account.

*alia*, that Cox Operating would pay a rental rate of $40,000 per month for the Vail Chalet to LSC—an amount more than sufficient to cover the monthly installments on the initial mortgage, taxes, and insurance for the Vail Chalet. Sanders executed the Vail Lease on behalf of both LSC as lessor and Cox Operating as lessee.

iv.     Following the closing of the purchase of the Vail Chalet, the Vail Chalet was extensively renovated at the direction and control of Brad Cox and Catherine Cox. Cox Operating either paid for the renovation or paid the installments on the construction loan of more than $15 million for the renovation, or a combination of the two. The lender on the construction loan was Independent Bank of Texas, and the borrowers were Catherine Cox, Brad Cox, and LSC. After construction was completed, the Vail Chalet was appraised for $36 million for the purpose of the Dynasty Trust[39] seeking to mortgage the property to the Royal Bank of Canada for a loan of more than $18 million. As part of that mortgage application, Sanders represented under oath that the loan would be used for business purposes only, not for personal, family, or household purposes. After that, the Cox family and other insiders continued to use the Vail Chalet for personal purposes. For at least a time Catherine Cox and her minor child with Brad Cox resided in the Vail Chalet.

v.     The total amount paid by Cox Operating for the Vail Chalet is not known to the Trustee at this time, but he has confirmed that payments exceed $6 million.

---

[39] While LSC 27, LLC is the record owner of the Vail Chalet, internal Cox Operating documents indicate LSC privately conveyed title to Defendant Dynasty Trust. If that conveyance occurred, it was not recorded in the public land records as required by state law.

c.      **The Lochridge Ranch:**

i.      The Lochridge Ranch is titled in the name of Eastex and other non-defendant related entities.

ii.      A separate credit card was issued by Cox Oil to Eastex for charges for the Lochridge Ranch. That credit card was paid by Cox Operating, with payments of at least $423,000 on cards held by Joselynne Scheen, Rob Stovall, and Dillon Taylor, all of whom were employed to manage the Lochridge Ranch.

iii.      Cox Operating also paid for elaborate and extraordinarily expensive improvements of the Lochridge Ranch. By way of illustration only, Catherine Cox demanded the installation of a children's play area, for which materials alone cost $70,000. Cox Operating also funded the purchase of a $25,000 rug, and extensive high-end flooring and other renovations.

iv.      The Trustee has not yet identified all transfers by Cox Operating made to or on behalf of the Lochridge Ranch, but he has confirmed those payments exceed $400,000.

d.      **The Trust Defendants:**

i.      The Trustee's investigation of payments made by Cox Operating to the Trust Defendants is continuing. As of this date, he has determined that Cox Operating directly transferred in excess of $1.1 million to the Bradley Trust.

ii.      The Edwin Trust owned a condominium at 1201 Canal Street, Unit No. 652, in Downtown New Orleans ("**1201 Canal Condo**"). Cox Operating used the 1201 Canal Condo as a crash pad for the Officer & Director Defendants and their guests when they were in New Orleans (whether or not for business purposes),

32

including Jennifer Savoie. Cox Operating paid for the utilities, maintenance, and other expenses for the 1201 Canal Condo. By instrument executed on August 20, 2024, and recorded on August 26, 2024, the Edwin Trust transferred the 1201 Canal Condo to NOLA Asset Holdings, LLC, a Delaware limited liability company as a purported "Act of Capital Contribution" by the Edwin Trust to NOLA Asset Holdings. DeVito signed as Manager for NOLA Asset Holdings. On the same day as that Act of Capital Contribution was executed, NOLA Asset Holdings and Flow Line executed a mortgage in favor of Lakeside Bank to secure a $500,000 promissory note.

89.    **Transfers to or for the benefit of other Defendants.** Cox Operating acted as a conduit for payment of expenses of various Defendants, including, by way of example:

a.    A credit card in the name of Cox Oil was used to pay for purchases by Brad Cox, and he gave his lady friend Jennifer Savoie unchecked use of this card. The periodic payments on the credit card were paid by Cox Operating.

i.    Payments from Cox Operating to Cox Oil between May 1, 2017, and the Petition Date amounted to at least $24 million.

ii.    Payments from Cox Operating to other Defendants between January 1, 2017, and the Petition Date exceeded $32 million and include the following (for which no consideration was provided to Cox Operating):

| | |
|---|---|
| (a) Quarantine Bay | $19,315,604.12 |
| (b) Cox Interests | $9,269,458.95 |
| (c) RCL Pelican | $1,945,528.86 |

33

    (d) Lochridge P&A                $1,419,421.56

    (e) RC L S Bay                  $820,876.47

    (f) Gathering                   $574,880.34

**C.   THE OFFICERS & DIRECTOR DEFENDANTS FAILED TO IMPLEMENT BASIC FINANCIAL CONTROLS FOR THE DEBTORS**

90.   The Officer & Director Defendants' duties to Cox Operating included ensuring that Cox Operating implemented and abided by appropriate financial management systems and financial controls. The Officer & Director Defendants failed miserably. For the most part, financial controls were never implemented. Those that were implemented were ignored or evaded.

91.   For example, Sanders routinely handled both sides of a proposed expenditure, and both requested and approved the expenditure.

92.   Sanders routinely arranged for wire transfers to be made from Cox Operating to various other entities in the Cox Enterprise, including the Defendants, and all within a matter of minutes. These arrangements served no legitimate purpose but simply provided camouflage to conceal that the payments were made by Cox Operating. For example, on September 13, 2018, Sanders directed a Cox accounting employee **not to record** the following transactions on the companies' books. On that date, Sanders executed more than $11 million in wire transfers, another example of Cox Operating's funneling exercises, to, in Sanders' own words, "prove funds on another deal but [was] reversing it all off,"[40] including the following transfers:

- $3,750,000 transferred from Cox Operating to Phoenix

- $3,750,000 transferred from Phoenix to CIP

---

[40] Sanders said this via email to Kirsten Usner, Cox Operating's cash accountant, on September 13, 2018.

- $3,750,000 transferred from CIP to LSC

Then, after funds were deposited into those respective accounts, Sanders reversed the transactions:

- $3,750,000 transferred from LSC  to CIP

- $3,750,000 transferred from CIP to Phoenix

- $3,750,000 transferred from Phoenix to Cox Operating

- $3,750,000 transferred from Cox Operating to Cox Oil

- $3,750,000 transferred from Cox Oil to MLCJR

One week later, on September 21, 2018, Sanders again directed movement of $3,750,000 to LSC to buy the Vail Chalet, as detailed *supra*, ¶ 89.b.2.

**D.   THE OFFICER & DIRECTOR DEFENDANTS PERMITTED THE AFFILIATE DEFENDANTS TO IGNORE THEIR DEBTS AND OTHER OBLIGATIONS TO <u>COX OPERATING</u>**

93.   As officers of Cox Operating, the Officer & Director Defendants were obliged to ensure the Affiliate Defendants paid their respective debts owed to Cox Operating and honor their other obligations owed to Cox Operating. In fact, the Officer & Director Defendants directed or permitted Affiliates Defendants to ignore those debts and other obligations.

94.   As of June 2017, Related Party Receivables amounted to more than $24 million. By early 2018, Related Party Receivables had grown to more than $41 million. In the years that followed, Related Party Receivables continued to be paid late or, more typically, not paid at all. Plainly, the Related Party Receivable were worth pennies on the dollar of what was shown on Cox Operating financial statements. Ultimately, the Related Party Receivables were wholly worthless.

95.   The Officer & Director Defendants did not implement any process to ensure the Related Party Receivables were paid timely (or even paid *eventually*), or, at a minimum, did not

35

continue to grow. The Officer & Director Defendants did nothing and permitted Related Party Receivables to both grow exponentially and become entirely worthless.

96.     By the Petition Date, Related Party Receivables exceeded $100 million and were wholly worthless.

97.     Similarly, the Officer & Director Defendants failed to enforce a promissory note due to Cox Operating from one of its affiliates. Specifically, in 2016, Sanders caused MLCJR to execute a promissory note in the amount of $17,149,792 and purportedly representing funds advanced by Cox Operating to MLCJR. Sanders signed the note on behalf of MLCJR. This note was renewed in December 2016 in the principal amount of $14,764,911. The note carried interest of 5% and was originally due in December 2021, but was amended on April 20, 2021, to extend the maturity date to December 2026. Both the original note and the amendment were signed by Sanders as both payor and payee. MLCRJ's financial statements show the loan amount as $15.72 million, but it was never recorded in Cox Operating's books, as an asset. Neither interest nor the principal were ever paid to Cox Operating by MLCJR.

98.     In addition, $12.5 million in notes receivable related to the down payment on the Crespi estate were booked on Cox Operating's financial statements but with no intention of payment of collection by any parties thereto.

99.     Likewise, the Officer & Director Defendants failed to enforce a commitment by the "family office investment vehicles" to make whatever cash infusion might be required for "operation of [Cox Operating and the other Debtors] to continue[.]"

100.    As detailed below, the auditors of MLCJR (the Fort Worth, Texas accounting firm of Whitley Penn ("**Whitley Penn**") considered issuing of a going concern opinion in both the 2019 and 2020 audited financial statements.

36

101.    The Officer & Director Defendants wanted to avoid the issuance of that opinion and instructed the Controller of Cox Operating to provide the auditors in 2020 and 2022 with a memorandum addressing why management of Cox Operating contended a going concern was neither appropriate nor justified.

102.    Among the reasons cited in the two memoranda as to why a going concern opinion should not be issued was that:

> The Company's current majority owner is a group of family office investment vehicles that have expressed it will fund any necessary cash required for operations to continue.

103.    The family office investment vehicles referenced in the memorandum were comprised of Phoenix, CW Facilities, WIN, CIP, Management Dallas, Brad Cox, and the Edwin Trust (collectively, the "**Family Office**").

104.    Sanders confirmed and personally authorized this commitment. At the time he was President of Phoenix, CW Facilities, WIN, CIP, and Management Dallas.

105.    Plainly, Cox Operating desperately required a cash infusion to continue operations.

106.    The commitment of Phoenix, CW Facilities, WIN, CIP, Management Dallas, Brad Cox, and the Edwin Trust to provide that cash infusion was a valid and legally binding obligation—which was never fulfilled.

107.    Yet the Officer & Director Defendants ignored that commitment and failed to secure the cash required by Cox Operating. As represented to the auditors, and consistent with their fiduciary duties, the Officer & Director Defendants should have sought to enforce the commitment. Hopelessly conflicted, they did nothing.

## VI.   THE VENDOR PONZI SCHEME

108.    Starting before January 1, 2017, and continuing through the Petition Date, Cox Operating conducted what amounted to a Vendor Ponzi scheme. This was done with the knowledge and approval of the Officer & Director Defendants.

109.    Cox Operating had grossly inadequate working capital to support both its operations, and the operations it managed (and funded) for the Cox Enterprise. The lack of working capital was exacerbated by the routine pilfering of cash from Cox Operating by the Defendants.

110.    Lacking working capital, Cox Operating relied upon unsecured trade credit provided by its various vendors to sustain its operations.

111.    Cox Operating's vendor trade debt continuously and drastically increased over time:

| | |
|---|---|
| 4th Quarter 2018: | in excess of $21 million |
| 4th Quarter 2019: | in excess of $79 million |
| 4th Quarter 2020: | in excess of $111 million |
| 1st Quarter 2021: | in excess of $136 million |
| 2d Quarter 2021: | in excess of $144 million |

112.    Not surprisingly, not only did vendor debt increase significantly, but Cox Operating became ever more delinquent in payments. For example:

| | |
|---|---|
| 4th Quarter 2019: | 69% of vendor debt was outstanding more than 60 days; and 29% was outstanding more than 90 days. |
| 4th Quarter 2020: | 86% of vendor debt was outstanding more than 60 days; and 73% was outstanding more than 90 days. |
| 4th Quarter 2021: | 75% of vendor debt was outstanding more than 90 days. |

4th Quarter 2022:         78% of vendor debt was outstanding more than 90 days.

113.    Cox Operating consistently failed to secure funds sufficient to pay its bills. Predictably, many trade vendors became increasingly wary of extending credit to Cox Operating. Accordingly, Cox Operating implemented a system by which account payable listings would be reviewed routinely to determine which were the most critical for provision of goods and services, and the minimum amount which could be paid to each—to keep goods and services flowing. At Cox Operating, this list was referred to as the "squeaky wheel list," and internally notated on spreadsheets by no later than September 3, 2019, with a "Complainer?" column to track vendor debt, wherein the "squeaky wheels" were internally identified. Cox Operating endeavored to pay its vendors the least possible amounts necessary to continue receiving services, leaving their remaining balances outstanding. Not surprisingly, the vendors who did not offer further goods and services that were considered critical were ignored entirely.

114.    Revenues generated by or otherwise attributable to a vendor's goods and services would not be used to pay that vendor, unless these vendors were designated a "squeaky wheel." Rather, that portion of revenue allocated for payments of vendor accounts payable would be used to pay other critical vendors whose invoices were overdue and threatened to terminate Cox Operating as a customer, i.e., the "squeaky wheels." In practice, this constituted a Vendor Ponzi scheme. Needless to say, this system was never disclosed to vendors, who quite reasonably expected their bills to be fully and timely paid.

115.    On the Debtors' Schedules debt obligations included:

Trade debts:                                in excess of **$250 million**

| Obligations on Surety Bonds and for Plugging & Abandonment Liability: | in excess of **$1 billion** |
|---|---|
| Taxes and Mineral Obligations: | in excess of **$68 million** |
| Unpaid Royalty Obligations to governmental entities: | in excess of **$30 million** |
| Secured Lender Debt: | in excess of $**200 million** |

## VII.   A COMPARISON OF LOOTED FUNDS, TRADE DEBT, AND RELATED PARTY RECEIVABLES

116.    During the six years prior to the Petition Date, vendor debts grew exponentially. During that same period, there was like growth in the amount of funds looted from Cox Operating and the amount of Related Party Receivables.

117.    These tables are illustrative:









41

## VIII. COX OPERATING WAS INSOLVENT

118.    An entity is insolvent from a balance sheet standpoint when its liabilities exceed the fair value of its assets. Cox Operating was likely insolvent from a balance sheet standpoint by no later than January 1, 2017.[41] Cox Operating remained insolvent on a balance sheet basis through the Petition Date.

119.    As of December 31, 2017, the internal financial statements of Cox Operating showed that Cox Operating's total assets exceeded total liabilities by more than $14 million.

120.    The reality was far different. As the Officer & Director Defendants well knew, the fair value of Cox Operating's assets was substantially less than indicated on the financial statements. Specifically, the assets of Cox Operating purportedly had a value of $48,486,619 as of January 1, 2018. Of that amount, however, $43,368,512 represented amounts supposedly owed to Cox Operating by various affiliates ("**Related Party Receivables**"), and those receivables were long past due and were not being paid. These Related Party Receivables were always, or would eventually become, entirely worthless. While the Related Party Receivables may have had some fair value as of January 1, 2018, that fair value was a fraction of the amount shown on internal financial statements.

121.    Notably, despite supposedly having a significant net worth and positive owners' equity, as of December 31, 2017, Cox Operating had a significantly negative cash balance.

---

[41] The Trustee's forensic analysis of Cox Operating's financial condition, including the amount of its liabilities and value, is continuing. The Trustee anticipates that analysis will demonstrate Cox Operating was insolvent from a balance sheet standpoint before January 1, 2017. The Trustee has concluded, and alleges herein, that Cox Operating had unreasonably small capital by no later than the second quarter of 2017. He has also concluded, and alleges herein, that by no later than the second quarter of 2017, Cox Operating routinely and knowingly incurred debts it could not repay in accordance with their respective terms.

122.    Related Party Receivables due to Cox Operating represented an increasingly significant portion of the supposed value of assets from January 1, 2018, through the Petition Date. Indeed, starting by no later than 2018, annual Related Party Receivables represented 62% or more of Cox Operating's purported asset value. For example, Related Party Receivables were booked at:

| 4th Quarter 2019: | in excess of $66 Million; 80% of current assets. |
| 4th Quarter 2020: | in excess of $137 Million; 95% of current assets. |

123.    Also, as of year's end 2019, Cox Operating acknowledged it had a negative net worth despite the grossly inflated value attributed to Related Party Receivables.

124.    By year end 2020, despite employing grossly inflated values for Related Party Receivables, Cox Operating's internal financial statement recognized a negative net worth of more than $14 million.

125.    As of year's end 2021, Cox Operating's internal financial statement should have shown negative net worth of more than $100 million. Total assets identified in internal financial statements amounted to $110 million but nearly $100 million of that amount represented uncollectable Related Party Receivables and the worthless related party notes. These total assets were dramatically overstated because they were largely uncollectable. In contrast, total liabilities were quantified at $112 million but were almost certainly dramatically understated to exclude the full extent of plugging and abandonment liabilities. Tellingly, Cox Operating had a negative cash balance of $9,928,000.

126.    Cox Operating's financial condition continued to deteriorate throughout 2022. At year's end 2022, its liabilities exceeded $280,145,000. Assets—net of the worthless Related Party

Receivables and worthless related party notes—amounted to something less than $73,000,000. This translated into a negative net worth of at least some $207 million.

127.    Cox Operating was hopelessly insolvent and remained so through the Petition Date.

## COUNT ONE
### Against the Officer& Director Defendants for Breaches of Fiduciary Duties

128.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

129.    At all relevant times, Brad Cox served as Chairman of the Board of Cox Operating and each of the other Debtors.

130.    At all relevant times, Sanders served as the President and Chief Executive Officer of Cox Operating and each of the other Debtors.

131.    At all relevant times, DeVito served as the President and Chief Executive Officer of Cox Operating and each of the other Debtors.

132.    As officers of Cox Operating, the Officer & Director Defendants owed fiduciary duties of good faith and fair dealing and loyalty to Cox Operating.

133.    Once Cox Operating slipped into the zone of insolvency, those same fiduciary duties were also owed to the creditors of Cox Operating.

134.    The fiduciary duties of loyalty, good faith and fair dealing  demanded that the Officer & Director Defendants each protect and advance the interests of Cox Operating exclusively, without divided loyalties and without regard to the competing interests of other persons and entities.

135.    In fact, the Officer & Director Defendants routinely and grossly breached the duties of loyalty, good faith, and care by the repetitive acts of self-dealing and looting detailed herein.

44

136.    The Officer & Director Defendants also breached their duties of loyalty, good faith, and fair dealing by failing to ensure Cox Operating had adequate financial controls and that assets of Cox Operating were only used for valid business purposes. Without limiting the generality of the foregoing, the Officer & Director Defendants breached their fiduciary duties in the following respects:

a.    Authorizing unlawful distributions to Phoenix in excess of $44.5 million after January 1, 2017;

b.    Authorizing unlawful distributions to CIP in excess of $35 million after January 1, 2017;

c.    Authorizing unlawful distributions to WIN Management of in excess of $11 million after January 1, 2017;

d.    Authorizing unlawful distributions to CLS Development of $2.5 million after January 1, 2017;

e.    Authorizing a base salary for Brad Cox of at least $950,000 *per month*, which grossly exceeded salaries paid by like companies of like assets, liabilities, and financial performance;

f.    Authorizing supposed return-on-equity distributions to CIP, which were in fact hidden payments of Brad Cox's quarterly federal income tax installments despite having no flow-through taxable income;

g.    Using funds of Cox Operating to pay credit cards used for large, routine, expensive, and lavish purchases by Catherine Cox and Jennifer Savoie, paying for Jennifer Savoie's expenses at a swanky downtown New Orleans condominium on Baronne Street, and later housing her at the 1201 Canal Condo;

h.    Directing and authorizing the use of Cox Operating to pay for ongoing maintenance, upkeep, and renovations to Brad Cox's Crespi Estate in Dallas, a home which has been advertised as "the finest home in America"[42] and "the priciest home in Texas,"[43] as well as the Lockridge Ranch and the Vail Chalet;

---

[42] https://dougnewby.com/home/finest-estate-home-in-america/.

[43] https://www.realtor.com/news/unique-homes/60m-crespi-estate-in-dallas-tx-is-the-states-most-expensive-home/.

i.      Directing and authorizing the use of Cox Operating to fund extensive domestic and international personal travel for Brad Cox, his family, his lady friend – Jennifer Savoie, the other Officer & Director Defendants, and other insiders, cronies, and friends;

j.      Causing Cox Operating to pay the down payment for the Vail Chalet and entering into bogus leases executed by Craig Sanders as lessor and lessee under which Cox Operating's funds were used to pay the monthly mortgage payment, taxes, insurance, and cost of maintenance;

k.      Failing to take any meaningful or effective steps to reduce the out-of-control general and administrative expenses of Cox Operating, including, failing to reduce the grossly excessive monthly salary paid to Brad Cox and his exorbitant travel and entertainment expenses;

l.      Failing to enforce the financial commitment made to Cox Operating and the other Debtors detailed in the memoranda to the auditors, failing to enforce related party notes, and failing to arrange for collection of the Related Party Receivables;

m.      Knowingly causing Cox Operating to incur trade debts and other accounts payable that Cox Operating could not possibly repay, timely or otherwise;

n.      Failing to attempt to reorganize Cox Operating and other Cox Entities at a time when there remained any realistic prospect that they could be reorganized successfully; and

o.      Authorizing Cox Operating to pay for the acquisition, renovation, and other expenses of the Crespi Estate, the Lockridge Ranch, and the Vail Chalet.

137.    Cox Operating suffered significant damage as a direct consequence of the self-dealings and other breaches of the duties of loyalty and good faith by the Officer & Director Defendants.

138.    After due proceedings, the Trustee is entitled to a judgment against the Officer & Director Defendants, jointly and *in solido*, for those damages as may be proven at the trial of this case.

46

**COUNT TWO**

**Against the Affiliate Defendants for Aiding and Abetting**

139.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

140.    A defendant is liable for aiding and abetting a breach of fiduciary duty if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another.

141.    The Officer & Director Defendants served as the officers of Cox Operating, the other Debtors, and also of each of the Affiliate Defendants.

142.    The Officer & Director Defendants knew, authorized, and directed the significant transfers from Cox Operating to the Affiliate Defendants, or at least knew of the occurrence of the transfers. Their knowledge is imputed to the Affiliate Defendants.

143.    The transfers by Cox Operating to the Affiliate Defendants amounted to a breach of the duties of loyalty, good faith, and fair dealing the Officer & Director Defendants owed to Cox Operating.

144.    The Affiliate Defendants aided and abetted these breaches by accepting the transfers.

145.    After due proceedings, the Trustee is entitled to a judgment against the Affiliate Defendants, jointly and *in solido*, for aiding and abetting the breach of fiduciary duties by the Officer & Director Defendants and an award of such damages as may be proven at the trial of this matter.

47

**COUNT THREE**

**Against the Affiliate Defendants and Officer & Director Defendants for Civil Conspiracy**

146. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

147. Pursuant to Louisiana Civil Code article 2342, "[h]e who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act."

148. The Affiliate Defendants conspired with the Officer & Director Defendants to commit the tortious acts alleged herein.

149. The Affiliate Defendants assisted the Officer & Director Defendants in improperly siphoning funds away from Cox Operating's legitimate creditors for the benefit of the Defendants and their close family members, friends, and cronies by accepting unlawful transfers and by further assisting in moving funds through their separate entities in a way that camouflaged the true source of the funds.

150. The Affiliate Defendants thereby assisted the Officer & Director Defendants in breaching their fiduciary duties of loyalty, good faith, and fair dealing.

151. The Affiliate Defendants also acted unlawfully by abusing the corporate form—as more fully described below—in order to avoid liability for Cox Operating's debts. The Affiliate Defendants abused the corporate form to move assets and funds out of Cox Operating—and out of legitimate creditors' reach—for the benefit of the Defendants.

152. In furtherance of their unlawful purpose, the Affiliate Defendants were enriched by the illegal distributions and transfers they received.

153. The Officer & Director Defendants knew, authorized, and directed the significant transfers or distributions from Cox Operating to the Affiliate Defendants, or at least knew of the occurrence of the transfers and distributions. Their knowledge is imputed to the Affiliate Defendants.

154. After due proceedings, the Trustee is entitled to a judgment against the Affiliate Defendants, jointly and *in solido*, for the damage caused by the Officer & Director Defendants, which their civil conspiracy proximately caused, and an award of such damages as may be proven at the trial of this matter.

## COUNT FOUR
**Against the Officer & Director Defendants, Trust Defendants, and the Affiliate Defendants, for a Declaratory Judgment That Their Separate Existence Should Be Disregarded, and They Should Be Declared a Single Business Enterprise with Cox Operating Liable for the Debts and Other Obligations of Cox Operating and the Debtors.**

155. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

156. The Debtors, Brad Cox, and the other Officer & Director Defendants, the Trust Defendants, and the Affiliate Defendants operated as a single economic entity—the Cox Enterprise—in such a way that resulted in an overall element of injustice and unfairness to their vendors, lenders, and other legitimate creditors.

157. The Cox Enterprise Defendants used Cox Operating to shield themselves from liability; they intentionally pushed liabilities and debts downward to Cox Operating while improperly siphoning funds out of Cox Operating without legitimate business purposes.

158. The Defendants' abuse of the corporate form created exceptional circumstances wherein they so disregarded the corporate form and corporate formalities such that they became

indistinguishable from Cox Operating, and they did so for unfair purposes, with an intent to deceive, and as a means to facilitate and perpetrate injustice.

159. In all aspects of their business, the Cox Enterprise Defendants functioned as a single entity and should be treated as such. The Family Office exercised complete domination and control over their subsidiaries, affiliates and Cox Operating in particular.

105. The Cox Enterprise Defendants and Cox Operating shared more than common control, directors, officers, employees, members, managers, and officers. Rather, the Cox Enterprise Defendants took frequent, regularly, and substantial improper payments from Cox Operating in the form of illegitimate transfers, distributions, or loans with no legitimate business purposes, as detailed herein. Cox Operating was the mere instrumentality of the Cox Enterprise Defendants, and represented precisely the same interest: the personal enrichment of insiders at the expense of legitimate creditors.

160. As delineated in the preceding paragraphs realleged herein, Cox Operating was undercapitalized, failed to observe corporate formalities, was insolvent, and functioned as a mere façade and instrumentality of operations for Cox Enterprise Defendants herein—all of whom improperly siphoned funds from Cox Operating and the Debtors.

161. The Family Office referenced in the memoranda tendered to the accounting firm of Whitney Penn at the instruction of Sanders guaranteed Cox Operating's solvency with a fraudulent commitment to provide any and all necessary funds to sustain operations, i.e., pay vendors and other creditors, with a knowing intent to deceive lenders and, likely the auditors—Whitley Penn. The Cox Enterprise Defendants knowingly, continually, and unjustifiably siphoned hundreds of millions of dollars out of Cox Operating when Cox Operating was insolvent and unable to pay its vendors as needed to sustain operations. The Cox Enterprise Defendants openly treated the Debtors

as their personal piggy banks44 while allowing legitimate creditor debts to remain unpaid. The Cox Enterprise Defendants never intended to pay the Related Party Receivables they owed to Cox Operating, to the fully known detriment of Cox Operating's creditors.

162.    Cox Operating was the alter ego of the Cox Enterprise Defendants. It was organized and operated as a mere tool and business conduit of the Family Office, including the Trust Defendants and certain Affiliate Defendants. The Cox Enterprise Defendants abused the corporate form as part of a unfair device to achieve inequitable results in favor of insiders and to the detriment of Cox Operating's and the other Debtors' vendors and other creditors.

163.    There was such unity between the Cox Enterprise Defendants and Cox Operating that Cox Operating's corporate separateness ceased to exist. The funneling exercises perpetrated by the Cox Enterprise Defendants, as described above and as yet to be discovered, evidence the Cox Enterprise Defendants' unity and lack of corporate separateness.

---

44 For example, on May 28, 2019, Sanders and the MLCJR CPA and CFO, Ken Jackson ("**Jackson**"), had the following exchange:

Sanders:    "Will you type a letter on letterhead and sign it as CFO for Brad's mortgage loan?"

Jackson:    "What company do you want it from and what do you want it to say?"….

Sanders:    "CPA/CFO of MLCJR LLC to provide signed/date [sic] letter stating that Bradley Cox has unrestricted authority to draw on the business credit line with Amarillo National Bank *for personal use* and does not require permission from the other partners to do so (CLS Development LLC and Win Management LLC), and that his accessing the line of credit, *up to and including the full amount, will not negatively impact the business.*" (emphasis added).

Jackson then provided and signed and requested letter, stating: "I am the Chief Financial Officer of MLCJR, LLC and Bradley Cox has unrestricted authority to draw on the business credit line with Amarillo National Bank for personal use and he does not require permission from the other partners to do so (CLS Development, LLC and Win Management, LLC). Further, his accessing the line of credit, up to and including the full amount, will not negatively impact the business."

51

164. Holding only Cox Operating liable for its debts would be inherently unjust and allow the other Cox Enterprise Defendants to knowingly, intentionally, and repeatedly abuse the corporate form to unjustly enrich themselves and their members at the cost of legitimate creditors.

165. The Cox Enterprise's unity was evidenced by more than mere centralized control or shared finances; rather, the entities forming the Cox Enterprise Defendants made illegitimate use of limited liability to shield assets and push off liabilities.

166. The Cox Enterprise Defendants functioned as alter egos of Cox Operating and their corporate separateness was pure fiction, created for an illegitimate purpose.

167. As delineated in the preceding paragraphs realleged herein, the following characterized the Cox Enterprise Defendants' relationship to Cox Operating:

   a.  substantial identity of ownership sufficient to give the Cox Enterprise Defendants actual working control over Cox Operating;

   b.  common directors and officers such that the Cox Enterprise Defendants and Cox Operating shared interlocking directorates;

   c.  unified administrative control over entities with similar or supplementary business functions;

   d.  financing one another's operations;

   e.  inadequate capitalization of Cox Operating;

   f.  causing the incorporation and formation of one another;

   g.  paying the salaries, expenses, and losses of one another;

   h.  certain Cox Enterprise Defendants only possessing business obtained from certain other Cox Enterprise Defendants or from Cox Operating;

   i.  Cox Operating and the Cox Enterprise Defendants using one another's properties as their own;

   j.  rampant noncompliance with corporate formalities;

k.      common employees;

l.      Cox Operating employees rendering services for and on behalf of the Cox Enterprise Defendants, and certain Cox Enterprise Defendants' employees rendering services for and on behalf of other Cox Enterprise Defendants and Cox Operating;

m.      common offices;

n.      centralized accounting;

o.      undocumented and improperly documented transfers between Cox Operating and the Cox Enterprise Defendants, and between the Cox Enterprise Defendants;

p.      unclear allocation of profits and losses between Cox Operating and the Cox Enterprise Defendants; and

q.      excessive fragmentation of the entire Cox Enterprise into Cox Operating and the various Cox Enterprise Defendants.

168.    Justice requires the Cox Enterprise Defendants of Cox Operating be treated as a single business enterprise for the protection of creditor rights. They functioned as a single business enterprise when it suited them; they should not now be allowed to hide behind the corporate form to escape liability.

## COUNT FIVE
**Against Phoenix, CW Facilities, WIN, CIP, Management Dallas, Brad Cox, and the Edwin Trust to Enforce Their Commitment to Fund Operations of Cox Operating and the other Debtors**

169.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

170.    Whitley Penn is a regional full-service accounting and advisory firm headquartered in Fort Worth, Texas.

171.    Prior to 2018, Whitley Penn performed the annual audit for Energy XXI and its various subsidiaries.

172. In 2018, Cox Operating acquired Energy XXI with MLCJR emerging as the corporate parent of Energy XXI and its subsidiaries. These subsidiaries included certain of the Debtors and Non-Debtor Affiliates.

173. Following the merger, Whitley Penn continued to prepare quarterly financial statements for MLCJR and its subsidiaries. Whitley Penn also performed various audit functions and prepared annual audited financial statements. As part of its work, Whitley Penn would evaluate whether MLCJR should be the subject of a going concern opinion. In substance, a going concern opinion evidences that the auditors have concluded that there is a material risk that the subject of the audit cannot financially sustain operations during the coming year.

174. While performing work required for the 2019 audit and conducting various testing related to the audit, members of the Whitley Penn audit team raised issue as to whether MLCJR should properly be the subject of a going concern opinion, and as to whether Cox Operating should be the subject of the 2019 audit.

175. In-house accountants and support staff employed by Cox Operating, including in particular Joe Winkler, Cox Operating's Controller, were the principal points of contact with the Whitley Penn audit team.

176. On April 27, 2020, Mr. Winkler delivered a memorandum to Whitley Penn that detailed why Cox Operating's management were strongly of the view that MLCJR, Cox Operating, and other Cox affiliates should not be the subject of a going concern opinion, and that a going concern opinion in the 2019 audit was neither appropriate nor justified.

177. The April 27, 2020 memorandum was addressed to both the Whitley Penn audit team and Sanders, the President and Chief Executive Officer of MLCJR, Cox Operating, and the other Debtors.

178.    Mr. Winkler offered several reasons why a going concern opinion was neither appropriate nor justified.

179.    Principal among these reasons was that the "family office investment vehicles" that owned MLCJR, Cox Operating, and the other Debtors had committed to make whatever cash infusions might be necessary to sustain their operations.

180.    Specifically, Mr. Winkler stated:

> The Company's current majority owner is a group of family office investment vehicles that have expressed it [sic] will fund any necessary cash required for operation to continue if needed…. The Company believes the Private Equity Sponsor has the wherewithal to provide additional funding, if needed.

181.    The "family office investment vehicles" referenced by Mr. Winkler were Phoenix, CW Facilities, WIN, CIP, Management Dallas, Brad Cox, and the Edwin Trust (previously defined and referred to hereinafter as the "**Family Office**").

182.    Mr. Winkler was directed by Craig Sanders to represent that the family office investment vehicles would fund any necessary cash required by Cox Operating. Sanders confirmed that commitment to Mr. Winkler.

183.    Mr. Winkler would not have documented the written commitment that the "group of family investment vehicles will fund any necessary cash required for operation to continue" unless specifically authorized and directed to do so by Sanders.

184.    Whitley Penn accepted the view of management of MLCJR, Cox Operating, and the other Debtors, and did not include a going concern opinion in the 2019 audit financial statement.

185.    Those audited financial statements were provided by Cox Operating to various entities, including its principal lenders—Amarillo National Bank and BP Energy Company.

186. The financial condition of MLCJR and Cox Operating, and the results of their operations, deteriorated significantly through 2021. The Whitley Penn audit team again raised issue as to whether the 2021 audited financial statements should include a going concern opinion.

187. On April 21, 2022, Mr. Winkler, acting at the direction of both Mark Smith, Cox Operating's then-Chief Financial Officer and Sanders, again authored and delivered to the Whitley Penn audit team a memorandum detailing the position of management on why a going concern opinion in the 2021 audited financial statements would be neither appropriate nor justified.

188. Again, Mr. Winkler represented that the "majority owner is a group of family office investment vehicles that have expressed that it will fund any necessary cash required for operation to continue, if needed."

189. The "group of family office investment vehicles" who made this funding commitment consisted of the Family Office.

190. Mark Smith and Sanders specifically authorized and directed Mr. Winkler to send the memorandum and to include confirmation of the funding commitment.

191. Whitley Penn again accepted the view of management of Cox Operating and the other Cox Entities, and did not include a going concern opinion in the 2021 audit financial statement. The 2021 audited financial statements, like the 2019 audited financial statements, were distributed to various creditors of MLCJR, Cox Operating, and the other Debtors, including their principal secured creditors.

192. Through 2022 and 2023, Cox Operating and the other Debtors were in desperate need of a very large cash infusion in order to continue operations. Despite the commitments set forth in the 2019 and 2021 Mr. Winkler's memoranda, the Family Office failed to provide the necessary infusion.

193.    The commitment made by the Family Office to fund the cash required for operations to continue is a legally binding and enforceable obligation.

194.    After due proceedings, the Trustee is entitled to a judgment against the Family Office, jointly and *in solido*, for breach of their solidary commitment to fund "cash required for operations to continue," and an award of such damages as may be proven at the trial of this matter.

## COUNT SIX
**Against LSC for a Declaratory Judgment that the Vail Chalet is Owned by the Debtors' Estates**

195.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

196.    Defendant LSC is a Delaware limited liability company founded in March 2014 by Brad Cox and Sanders to purchase the Vail Condo to be used by Brad Cox, his family, Sanders, and other insiders of the Cox Enterprise.

197.    LSC's sole member at the time of formation was CIP. Its manager was Sanders.

198.    On or about July 16, 2014, LSC acquired the real property described as 660 W. Lionshead Plaza Unit 27, Vail, CO 81657 (the Vail Condo), by Warranty Deed recorded July 18, 2014, for the purchase price of $3,250,000. This real property is more specifically described as:

> CONDOMINIUM UNIT 27, LION SQUARE CONDOMINIUMS, ACCORDING TO THE MAP THEREOF FILED FOR RECORD IN BOOK 220 AT PAGE 177, AND AS DEFINED AND DESCRIBED IN THAT DECLARATION FOR LION SQUARE CONDOMINIUMS RECORDED IN BOOK 220 AT PAGE 176, COUNTY OF EAGLE, STATE OF COLORADO.

199.    Cox Operating, directly or indirectly, provided the funds to purchase the Vail Condo.

106.    LSC sold the Vail Condo by Warranty Deed recorded May 18, 2017, for $4,000,000 to a third party.

200.    LSC purchased the real property described as 696 Forest Road, Vail Colorado 81657 (the Vail Chalet) by Warranty Deed recorded September 26, 2018. The property is more specifically described as:

> LOT 8, A RESUBDIVISION OF LOTS 7 AND 8, BLOCK 1, VAIL VILLAGE, SIXTH FILLING, SECOND AMENDMENT, ACCORDING TO THE PLAT RECORDED JULY 29, 2019 UNDER RECEPTION NO. 201911865, COUNTY OF EAGLE, STATE OF COLORADO.

201.    The net proceeds from the sale of the Vail Condo were not sufficient to pay the down payment on the Vail Chalet. At the direction of Sanders, funds of approximately $3.75 million, were sent by Cox Operating to an account for the benefit of LSC, through a series of transfers, to cover the down payment.

202.    The funneling exercises detailed *supra* in ¶¶ 89.b.2 and 93 were employed to camouflage the source of funds used to purchase the Vail Chalet.

203.    The balance of the purchase price was obtained from an entity known as Blue Sky Mortgage, LLC. Blue Sky obtained a First Deed of Trust encumbering the Vail Chalet as security.

204.    Shortly after the closing of the purchase of the Vail Chalet, Sanders caused Cox Operating and LSC to enter into a bogus lease (the Vail Lease) by which Cox Operating agreed to pay monthly rent of $40,000 per month. That amount was sufficient to pay monthly installments on the Blue Sky note, taxes, insurance, and costs of upkeep and staffing.

205.    LSC later took out a construction loan of more than $15 million with Independent Bank, a Texas state-chartered banking corporation, to execute a complete renovation of the Vail Chalet, which included a full remodel, the installation of a private interior elevator, and the

58

construction of a private funicular providing access to the pool house, pool, and jacuzzi. This construction loan is secured by a First Deed of Trust in favor of Independent Bank. The Blue Sky Deed of Trust was released simultaneously with the new loan.

206.    Since LSC's acquisition of the Vail Chalet, Cox Operating paid the mortgage(s) on the Vail Chalet and transferred to LSC significant sums for renovations and maintenance of the property. Known transfers from Cox Operating to LSC alone exceed $1.9 million. The purchase of the Vail Chalet and the transfers to LSC were solely for the benefit of insiders of the Cox Enterprise, including Brad Cox and his family.

207.    Specific transfers by Cox Operating to LSC included monthly $40,000 payments under the bogus Vail Lease between LSC and Cox Operating. The Vail Lease was executed by Sanders on behalf of both Cox Operating as lessee and LSC as lessor.

208.    Internal documents of Cox Operating demonstrate that the Officer & Director Defendants indicated an interest to transfer ownership of the Vail Chalet to the Dynasty Trust. The public records evidence that LSC is the record owner, but the Trustee reserves the right to substitute the Dynasty Trust for LSC in this count as needed or appropriate.

209.    Cox Operating has paid for the Vail Chalet, and Cox Operating—rather than LSC or the Dynasty Trust—should be recognized as the true and lawful owner of the Vail Chalet.

210.    After due proceedings, the Trustee is entitled to a declaratory judgment to the effect that the estate of Cox Operating is the owner of the Vail Chalet and, as such, enjoys all rights and privileges of ownership, including the unfettered right to sell or otherwise dispose of the Vail Chalet. He is further entitled to a judgment to the appropriate public official directing that the title to the Vail Chalet appear in his name as Trustee of Cox Operating

**COUNT SEVEN**

**Against the Dynasty Trust for a Declaratory Judgment that the Crespi Estate is Owned by the Debtors' Estates**

211.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

212.    The Dynasty Trust is a trust organized and existing under the laws of the State of Texas. Its co-trustees are Sanders and William Graham. The Dynasty Trust was used to purchase Brad Cox's luxury home in Dallas, Texas, the Crespi Estate, or otherwise touted as the "priciest home in Texas."

213.    The Dynasty Trust acquired the real property described as 5619 Walnut Hill Lane, Dallas, TX 75229 (herein referred to as the Crespi Estate) by Special Warranty Deed with Vendor's Lien recorded June 26, 2019, for $29,000,000. This real property is more particularly described as:

> Being Lots 1F, 1G, and 1H, Block 1/5516 of CRESPI ESTATES, an Addition to the City of Dallas, Dallas County, Texas, according to the plat thereof recorded in cc# 201900146878, Real Property Records, Dallas County, Texas.

214.    Cox Operating, directly or indirectly, provided funds to purchase the Crespi Estate.

215.    At the direction of the Officer & Director Defendants, a $12.5 million downpayment was paid through a series of funneling exercises, further described *supra* in ¶¶ 89.a.1.

216.    The funneling exercises were used to characterize the $12.5 million funds of Cox Operating, as a note receivable owing to Cox Operating, but it was not a collectable receivable and was booked to inflate Cox Operating's assets.

217. Apparently using the Cox Operating $12.5 million as part of the purchase price, UBS Bank USA financed the balance of the purchase of the property with a $29 million loan, evidenced by a Deed of Trust recorded June 27, 2019. The Cox Operating $12.5 million was not evidenced by a lien against the Crespi Estate.

218. Cox Operating also paid for ongoing maintenance, upkeep, and renovations of the Crespi Estate.

219. In 2021, the Crespi Estate was appraised for $31 million, and the Dynasty Trust mortgaged the Crespi Estate to the Royal Bank of Canada for $30.4 million.

220. In 2025, the Crespi Estate was listed for sale at a price of $64 million.

221. Cox Operating has paid for the Crespi Estate, and Cox Operating—not the Dynasty Trust—should be recognized as the true and lawful owner of the Crespi Estate.

222. After due proceedings, the Trustee is entitled to a declaratory judgment to the effect that the estate of Cox Operating is the owner of the Crespi Estate and, as such, enjoys all rights and privileges of ownership, including the unfettered right to sell or otherwise dispose of the Crespi Estate. He is further entitled to a judgment to the appropriate public official directing the title to the Crespi Estate appear in his name as Trustee of Cox Operating.

### COUNT EIGHT
**Against Brad Cox for Avoidance of Transfers Made in Violation of the Texas Uniform Fraudulent Transfer Act[45]**

223. The Trustee repeats and realleges the foregoing paragraphs as though stated herein

---

[45] Transfers set forth herein are governed by Texas law. In this regard, Section 24.007 of TUFTA provides that a transfer is made when the recipient—transferee—has acquired such right that a creditor of the transferor "cannot acquire an interest in the asset that is superior to the interest of the transferee." With respect to the Brad Cox Transfers (and the other transfers sought to be avoided by the Trustee), that did not occur until the transferred assets, primarily cash, were received by or on behalf of Brad Cox (or other Defendant Transferees) in Texas.

in full.

224.     The Texas Uniform Fraudulent Transfer Act, as set forth in the Texas Business & Commercial Code § 24.001, *et seq.*, ("**TUFTA**"), provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property.

225.     The statute provides a nonexclusive list of "badges of fraud" that may be considered to determine fraudulent intent. The Trustee is entitled to avoid the transfers made by Cox Operating to Brad Cox pursuant to TUFTA.

226.     From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Brad Cox in the form of a grossly inflated salary and indirect transfers made through the Defendant Transferees (as identified in **Exhibit C**, attached hereto, and detailed herein *infra* in the counts below) ("**Brad Cox Transfers**"), which included payment for extravagant personal travel, entertainment, and living expenses. Brad Cox treated Cox Operating as his personal piggy bank.[46]

227.     Before his base salary was raised to $950,000 per month, Cox Operating directly paid for the costs of acquisition and maintaining the Crespi Estate and the Vail Chalet, and the cost of staffing, furnishing, and upkeep of the Lockridge Ranch. Brad Cox's $11.4 million per year base salary was calculated not to compensate him for his services, but to cover the costs of his lavish manor and other exorbitant lifestyle expenses. Even once Brad Cox's base salary was raised to nearly $12 million per year, Cox Operating and the other Debtors continued to improperly pay for personal services provided to Brad Cox and his family, including, for example, extensive home renovations. Cox Operating reimbursed other outrageous expenses incurred by Brad Cox,

---

[46] Sanders best explained how Brad Cox treated Cox Operating when he stated on April 2, 2019: "Brad owns the operating company and can take the funds whenever."

including, by way of illustration, a three-day trip to Cabo that cost the company close to $100,000. The foregoing expenditures are only the tip of the iceberg when it comes to the personal expenses Brad Cox required that Cox Operating and the other Debtors pay.

228.    Cox Operating not only paid Brad Cox an exorbitant salary, but also made contributions to him through CIP to pay his quarterly federal income tax.

229.    At this time, the Trustee has not identified nor quantified all transfers made to or for the benefit of Brad Cox. Based upon the analysis performed to date, he believes and therefore asserts that the amount of the Brad Cox Transfers exceed $100 million.

230.    Brad Cox gave no consideration for any of the Brad Cox Transfers. Each of the Brad Cox Transfers reduced the net worth of Cox Operating and the value of its assets.

231.    At the time of each of the Brad Cox Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Brad Cox Transfers.

232.    In addition, at all times between January 1, 2017, and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

233.    In the alternative, throughout the period of January 1, 2017, through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

234.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017, and remained creditors of Cox Operating as of the Petition Date. A partial list of the creditors is attached as **Exhibit D**.

63

235.    The Trustee is entitled to avoid all Brad Cox Transfers and to recover the sum of all such Brad Cox Transfers pursuant to Section 24.005 of TUFTA because the Brad Cox Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, the Trustee is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Brad Cox gave no consideration whatsoever for any of the transfers.

236.    In the further alternative, the Trustee is entitled to avoid all Brad Cox Transfers and to recover the sum of all such Brad Cox Transfers because (i) there was no consideration given by Brad Cox for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Brad Cox Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular Brad Cox and the other Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

237.    The Trustee is also entitled to avoid all of the Brad Cox Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer was made and were also creditors of Cox Operating as of the Petition Date; (ii) Mr. Cox gave no consideration for any of the Brad Cox Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Brad Cox Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

238.    Avoidance of the Brad Cox Transfers, and the avoidance of all of the other transfers challenged herein, shall properly be governed by Texas law for at least the following reasons:

a.    The Brad Cox Transfers, and the other transfers sought to be avoided, were directed and authorized by one or more of the Officer and Director Defendants, Sanders in particular. The Officer and Director Defendants were headquartered in Texas.

b.    TUFTA itself provides that a transfer of cash, non-real estate, or other assets occurs when the transferee actually receives the funds. That occurred in Texas for all transfers challenged herein.

c.    The principal bank accounts of Cox Operating and other members of the Cox Enterprise were located in Texas.

239.    After due proceedings, the Trustee is entitled to a judgment against Brad Cox in the amount of the Brad Cox Transfers, which exceed $100 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

**COUNT NINE**
**Against Brad Cox for Avoidance of the Brad Cox Transfers**
**Pursuant to 11 U.S.C. § 548**

240.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

241.    Alternatively, the Trustee is entitled to avoid the Brad Cox Transfers pursuant to 11 U.S.C. § 548.

242.    The Brad Cox Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

243.    Alternatively, the Brad Cox Transfers may be avoided because the Brad Cox

Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT TEN
**Against the Bradley Trust for Avoidance of Transfers Made in Violation of TUFTA**

244.    The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

245.    The Trustee is entitled to avoid the transfers made by Cox Operating to the Bradley Trust pursuant to TUFTA.

246.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to or on behalf of the Bradley Edwin Cox Trust ("**Bradley Trust Transfers**"). The Trustee has not yet identified or qualified all of the Bradley Trust Transfers but the analysis performed to date establishes that the Bradley Trust Transfers amount to not less than $1.1 million. The specific transfers are identified in **Exhibit C**.

247.    The Bradley Trust gave no consideration for any of the Bradley Trust Transfers. Each of the Bradley Trust Transfers reduced the net worth of Cox Operating and the value of its assets.

248.    At the time of each of the Bradley Trust Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Bradley Trust Transfers.

66

249.    In addition, at all times between January 1, 2017, and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

250.    In the alternative, throughout the period of January 1, 2017, through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

251.    As evidenced by Exhibit C, certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

252.    The Trustee is entitled to avoid all Bradley Trust Transfers and to recover the sum of all such Bradley Trust Transfers pursuant to Section 24.005 of TUFTA because the Bradley Trust Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and the Bradley Trust gave no consideration whatsoever for any of the transfers.

253.    In the further alternative, the Trustee is entitled to avoid all Bradley Trust Transfers and to recover the sum of all such Bradley Trust Transfers because (i) there was no consideration given by the Bradley Trust for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Bradley Trust Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating

67

(including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

254.    The Trustee is also entitled to avoid all of the Bradley Trust Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Bradley Trust gave no consideration for any of the Bradley Trust Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Bradley Trust Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

255.    After due proceedings, Trustee is entitled to a judgment against the Bradley Trust in the amount of the Bradley Trust Transfers, which exceed $1.1 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT ELEVEN
### Against the Bradley Trust for Avoidance of the Bradley Trust Transfers
### Pursuant to 11 U.S.C. § 548

256.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

257.    Alternatively, the Trustee is entitled to avoid the Bradley Trust Transfers pursuant to 11 U.S.C. § 548.

258.    The Bradley Trust Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

68

259. Alternatively, the Bradley Trust Transfers may be avoided because the Bradley Trust Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT TWELVE
### Against Edwin Trust for Avoidance of Transfers Made in Violation of TUFTA

260. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

261. The Trustee is entitled to avoid the transfers made by Cox Operating to the Edwin Trust pursuant to TUFTA.

262. From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to or on behalf of the Edwin Trust ("**Edwin Trust Transfers**"). The Trustee has not yet identified or qualified all of the Edwin Trust Transfers but the analysis performed to date establishes that the Edwin Trust Transfers amount to not less than $330,000 in bogus rent payments relating to the 1201 Canal Condo.

263. The Edwin Trust gave no consideration for any of the Edwin Trust Transfers. Each of the Edwin Trust Transfers reduced the net worth of Cox Operating and the value of its assets.

264. At the time of each of the Edwin Trust Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Edwin Trust Transfers.

69

265.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

266.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

267.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

268.    Trustee is entitled to avoid all Edwin Trust Transfers and to recover the sum of all such Edwin Trust Transfers pursuant to Section 24.005 of TUFTA because the Edwin Trust Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and the Edwin Trust gave no consideration whatsoever for any of the transfers.

269.    In the further alternative, the Trustee is entitled to avoid all Edwin Trust Transfers and to recover the sum of all such Edwin Trust Transfers because (i) there was no consideration given by the Edwin Trust for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Edwin Trust Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

270.    The Trustee is also entitled to avoid all of the Edwin Trust Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) the Edwin Trust gave no consideration for any of the Edwin Trust Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Edwin Trust Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

271.    After due proceedings, Trustee is entitled to a judgment against the Edwin Trust in the amount of the Edwin Trust Transfers, which exceed $330,000, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT THIRTEEN
### Against Edwin Trust for Avoidance of the Edwin Trust Transfers
### Pursuant to 11 U.S.C. § 548

272.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

273.    Alternatively, the Trustee is entitled to avoid the Edwin Trust Transfers pursuant to 11 U.S.C. § 548.

274.    The Edwin Trust Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

275.    Alternatively, the Edwin Trust Transfers may be avoided because the Edwin Trust Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b)

71

had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT FOURTEEN
### Against Cox Gathering LLC for Avoidance of Transfers Made in Violation of TUFTA

276.    The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

277.    The Trustee is entitled to avoid the transfers made by Cox Operating to Gathering pursuant to TUFTA.

278.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Gathering ("**Gathering Transfers**"). The Trustee has not yet identified or qualified all of the Gathering Transfers but the analysis performed to date establishes that the Gathering Transfers amount to not less than $500,000. The specific transfers are identified in **Exhibit C**.

279.    Gathering gave no consideration for any of the Gathering Transfers. Each of the Gathering Transfers reduced the net worth and value of the assets of Cox Operating.

280.    At the time of each of the Gathering Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Gathering had a negative net worth on the date of each of the Cox Interests Transfers.

281.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

72

282.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

283.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

284.    Trustee is entitled to avoid all Gathering Transfers and to recover the sum of all such Gathering Transfers pursuant to Section 24.005 of TUFTA because the Gathering Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Gathering gave no consideration whatsoever for any of the transfers.

285.    In the further alternative, the Trustee is entitled to avoid all Gathering Transfers and to recover the sum of all such Gathering Transfers because (i) there was no consideration given by Gathering for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Gathering Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

286.    The Trustee is also entitled to avoid all of the Gathering Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date;

73

(ii) Gathering gave no consideration for any of the Gathering Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Gathering Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

287. After due proceedings, the Trustee is entitled to a judgment against Gathering in the amount of the Gathering Transfers, which exceed $500,000 plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

**COUNT FIFTEEN**
**Against Cox Gathering LLC for Avoidance of the Gathering Transfers**
**Pursuant to 11 U.S.C. § 548**

288. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

289. Alternatively, the Trustee is entitled to avoid the Gathering Transfers pursuant to 11 U.S.C. § 548.

290. The Gathering Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

291. Alternatively, the Gathering Transfers may be avoided because the Gathering Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

74

## COUNT SIXTEEN
### Against Cox Interests LLC for Avoidance of Transfers Made in Violation of TUFTA

292. The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

293. The Trustee is entitled to avoid the transfers made by Cox Operating to Cox Interests pursuant to TUFTA.

294. From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Cox Interests ("**Cox Interests Transfers**"). The Trustee has not yet identified or qualified all of the Cox Interests Transfers but the analysis performed to date establishes that the Cox Interests Transfers amount to not less than $9.2 million. The specific transfers are identified in **Exhibit C**.

295. Cox Interests gave no consideration for any of the Cox Interests Transfers. Each of the Cox Interests Transfers reduced the net worth and value of the assets of Cox Operating.

296. At the time of each of the Cox Interests Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Interests had a negative net worth on the date of each of the Cox Interests Transfers.

297. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

298. In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

299.     Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

300.     Trustee is entitled to avoid all Cox Interests Transfers and to recover the sum of all such Cox Interests Transfers pursuant to Section 24.005 of TUFTA because the Cox Interests Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Cox Interests gave no consideration whatsoever for any of the transfers.

301.     In the further alternative, the Trustee is entitled to avoid all Cox Interests Transfers and to recover the sum of all such Cox Interests Transfers because (i) there was no consideration given by Cox Interests for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Cox Interests Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

302.     The Trustee is also entitled to avoid all of the Cox Interests Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Cox Interests gave no consideration for any of the Cox Interests Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Cox

76

Interests Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

303. After due proceedings, Trustee is entitled to a judgment against Cox Interests in the amount of the Cox Interests Transfers, which exceed $9.2 million plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT SEVENTEEN
### Against Cox Interests LLC for Avoidance of the Cox Interests Transfers
### Pursuant to 11 U.S.C. § 548

304. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

305. Alternatively, the Trustee is entitled to avoid the Cox Interests Transfers pursuant to 11 U.S.C. § 548.

306. The Cox Interests Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

307. Alternatively, the Cox Interests Transfers may be avoided because the Cox Interests Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT EIGHTEEN
### Against Cox Oil for Avoidance of Transfers to Cox Oil Made in Violation of TUFTA

308. The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

77

309.    The Trustee is entitled to avoid the transfers made by Cox Operating to Cox Oil pursuant to TUFTA.

310.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Cox Oil LLC ("**Cox Oil Transfers**"). The Trustee has not yet identified or qualified all of the Cox Oil Transfers but the analysis performed to date establishes that the Cox Oil Transfers amount to not less than $24 million. The specific transfers are identified in **Exhibit C**.

311.    Cox Oil gave no consideration for any of the Cox Oil Transfers. Each of the Cox Oil Transfers reduced the net worth of Cox Operating and the value of its assets.

312.    At the time of each of the Cox Oil Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Cox Oil Transfers.

313.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

314.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

315.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

316.    The Trustee is entitled to avoid all Cox Oil Transfers and to recover the sum of all such Cox Oil Transfers pursuant to Section 24.005 of TUFTA because the Cox Oil Transfers were

made, individually and collectively, with actual intent to hinder, delay or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Cox Oil gave no consideration whatsoever for any of the transfers.

317.    In the further alternative, the Trustee is entitled to avoid all Cox Oil Transfers and to recover the sum of all such Cox Oil Transfers because (i) there was no consideration given by Cox Oil for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Cox Oil Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

318.    The Trustee is also entitled to avoid all of the Cox Oil Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Cox Oil gave no consideration for any of the Cox Oil Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Cox Oil Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

319.    After due proceedings, the Trustee is entitled to a judgment against Cox Oil in the amount of the Cox Oil Transfers, which exceed $24 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT NINETEEN
### Against Cox Oil for Avoidance of the Cox Oil Transfers
### Pursuant to 11 U.S.C. § 548

320. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

321. Alternatively, the Trustee is entitled to avoid the Cox Oil Transfers pursuant to 11 U.S.C. § 548.

322. The Cox Oil Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

323. Alternatively, the Cox Oil Transfers may be avoided because the Cox Oil Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT TWENTY
### Against Eastex for Avoidance of Transfers to Eastex Made in Violation of TUFTA

324. The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

325. The Trustee is entitled to avoid the transfers made by Cox Operating to Eastex pursuant to TUFTA.

326. From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to or on behalf of Eastex ("**Eastex Transfers**"). These transfers included payments for substantial renovations, expensive furnishings, house staff (including a "lodge manager" whose job duties included bathing Brad and Catherine Cox's dogs), credit card spending, cases of wine,

80

and several cars. The Trustee has not yet identified or qualified all of the Eastex Transfers but the analysis performed to date establishes that the Eastex Transfers amount to approximately $400,000.[47]

327. Eastex gave no consideration for any of the Eastex Transfers. Each of the Eastex Transfers reduced the net worth of Cox Operating and the value of its assets.

328. At the time of each of the Eastex Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Eastex Transfers.

329. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

330. In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

331. Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

332. Trustee is entitled to avoid all Eastex Transfers and to recover the sum of all such Eastex Transfers pursuant to Section 25.005 of TUFTA because the Eastex Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox

---

[47] Because the Debtors failed to itemize in their accounting records the transactions made on the Cox Oil credit cards (which were paid by Cox Operating), the Trustee does not at this time have complete itemized records for the Eastex Transfers.

Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Eastex gave no consideration whatsoever for any of the transfers.

333.    In the further alternative, the Trustee is entitled to avoid all Eastex Transfers and to recover the sum of all such Eastex Transfers because (i) there was no consideration given by Eastex for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Eastex Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

334.    The Trustee is also entitled to avoid all of the Eastex Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Eastex gave no consideration for any of the Eastex Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Eastex Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

335.    After due proceedings, the Trustee is entitled to a judgment against Eastex in the amount of the Eastex Transfers, which exceed $400,000, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT TWENTY-ONE
### Against Eastex for Avoidance of Eastex Transfers
### Pursuant to 11 U.S.C. § 548

336.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

337.    Alternatively, the Trustee is entitled to avoid the Eastex Transfers pursuant to 11 U.S.C. § 548. The Eastex Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

338.    Alternatively, the Eastex Transfers may be avoided because the Eastex Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT TWENTY-TWO
### Against Flow Line for Avoidance of Transfers Made in Violation of TUFTA

339.    The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

340.    The Trustee is entitled to avoid the transfers made by Cox Operating to Flow Line pursuant to TUFTA.

341.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made the transfers to Flow Line ("**Flow Line Transfers**"). The Trustee has not yet identified or qualified all of the Flow Line Transfers but the analysis performed to date establishes that the Flow Line Transfers amount to not less than $6.8 million. The specific transfers identified by the Trustee as of their date appear on **Exhibit C**.

342.    Flow Line gave no consideration for any of the Flow Line Transfers or consideration having a value substantially less than the amount of Flow Line Transfers. Each of the Flow Line Transfers reduced the net worth and value of the assets of Cox Operating.

343.    At the time of each of the Flow Line Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Flow Line Transfers.

344.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

345.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

346.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

347.    The Trustee is entitled to avoid all Flow Line Transfers and to recover the sum of all such Flow Line Transfers pursuant to Section 24.005 of TUFTA because the Flow Line Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Flow Line gave no consideration whatsoever for any of the transfers.

348.    In the further alternative, the Trustee is entitled to avoid all Flow Line Transfers and to recover the sum of all such Flow Line Transfers because (i) there was no or grossly

inadequate consideration given by Flow Line for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Flow Line Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

349.    The Trustee is also entitled to avoid all of the Flow Line Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Flow Line gave no consideration for any of the Flow Line Transfers, or, if any consideration was given, it was consideration which was not of a value reasonably equivalent to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Flow Line Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

350.    After due proceedings, the Trustee is entitled to a judgment against Flow Line in the amount of the Flow Line Transfers, which exceed $6.8 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT TWENTY-THREE
**Against Flow Line for Avoidance of the Flow Line Transfers Pursuant to 11 U.S.C. § 548**

351.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

352.    Alternatively, the Trustee is entitled to avoid the Flow Line Transfers pursuant to 11 U.S.C. § 548.

85

353.    The Flow Line Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

354.    Alternatively, the Flow Line Transfers may be avoided because the Flow Line Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

**COUNT TWENTY-FOUR**
**Against Half Moon for Avoidance of Transfers Made in Violation of TUFTA**

355.    The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

356.    The Trustee is entitled to avoid the transfers made by Cox Operating to Half Moon pursuant to TUFTA.

357.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made the transfers to Half Moon ("**Half Moon Transfers**"). The Trustee has not yet identified or qualified all of the Half Moon Transfers but the analysis performed to date establishes that the Half Moon Transfers amount to not less than $9.7 million. The specific transfers identified by the Trustee as of their date appear on **Exhibit C**.

358.    Half Moon gave no consideration for any of the Half Moon Transfers or consideration having a value substantially less than the amount of Half Moon Transfers. Each of the Half Moon Transfers reduced the net worth and value of the assets of Cox Operating.

359.    At the time of each of the Half Moon Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more

fully described above, Cox Operating had a negative net worth on the date of each of the Half Moon Transfers.

360.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

361.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

362.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

363.    The Trustee is entitled to avoid all Half Moon Transfers and to recover the sum of all such Half Moon Transfers pursuant to Section 24.005 of TUFTA because the Half Moon Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Half Moon gave no consideration whatsoever for any of the transfers.

364.    In the further alternative, the Trustee is entitled to avoid all Half Moon Transfers and to recover the sum of all such Half Moon Transfers because (i) there was no or grossly inadequate consideration given by Half Moon for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Half Moon Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating

87

(including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

365.    The Trustee is also entitled to avoid all of the Half Moon Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Half Moon gave no consideration for any of the Half Moon Transfers, or, if any consideration was given, it was consideration which was not of a value reasonably equivalent to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Half Moon Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

366.    After due proceedings, the Trustee is entitled to a judgment against Half Moon in the amount of the Half Moon Transfers, which exceed $9.7 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT TWENTY-FIVE
### Against Half Moon for Avoidance of the Half Moon Transfers Pursuant to 11 U.S.C. § 548

367.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

368.    Alternatively, the Trustee is entitled to avoid the Half Moon Transfers pursuant to 11 U.S.C. § 548.

369.    The Half Moon Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

370.    Alternatively, the Half Moon Transfers may be avoided because the Half Moon Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b)

88

had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT TWENTY-SIX
### Against Lochridge P&A for Avoidance of Transfers Made in Violation of TUFTA

371. The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

372. The Trustee is entitled to avoid the transfers made by Cox Operating to Lochridge P&A pursuant to TUFTA.

373. From at least January 1, 2017 through the Petition Date, Cox Operating Company made the transfers to Lochridge P&A ("**Lochridge P&A Transfers**"). The Trustee has not yet identified or qualified all of the Lochridge P&A Transfers but the analysis performed to date establishes that the Lochridge P&A Transfers amount to not less than $1.4 million. The specific transfers are identified in **Exhibit C**.

374. Lochridge P&A gave no consideration for any of the Lochridge P&A Transfers. Each of the Lochridge P&A Transfers reduced the net worth and value of the assets of Cox Operating.

375. At the time of each of the Lochridge P&A Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Lochridge P&A Transfers.

376. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

377.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

378.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

379.    The Trustee is entitled to avoid all Lochridge P&A Transfers and to recover the sum of all such Lochridge P&A Transfers pursuant to Section 24.005 of TUFTA because the Lochridge P&A Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Lochridge P&A gave no consideration whatsoever for any of the transfers.

380.    In the further alternative, the Trustee is entitled to avoid all Lochridge P&A Transfers and to recover the sum of all such Defendant Transferee Transfers because (i) there was no consideration given by Lochridge P&A for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Lochridge Energy Services Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

381.    The Trustee is also entitled to avoid all of the Lochridge P&A Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox

Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Lochridge P&A gave no consideration for any of the Lochridge P&A Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Lochridge P&A Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

382.     After due proceedings, the Trustee is entitled to a judgment against Lochridge P&A in the amount of the Lochridge P&A Transfers, which exceed $1.4 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT TWENTY-SEVEN
### Against Lochridge P&A for Avoidance of the Lochridge P&A Transfers
### Pursuant to 11 U.S.C. § 548

383.     The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

384.     Alternatively, the Trustee is entitled to avoid the Lochridge P&A Transfers pursuant to 11 U.S.C. § 548.

385.     The Lochridge P&A Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

386.     Alternatively, the Lochridge P&A Transfers may be avoided because the Lochridge P&A Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

91

**COUNT TWENTY-EIGHT**

**Against LSC for avoidance of Transfers to LSC made in Violation of the Colorado Revised Statute Uniform Fraudulent Transfer Act, Colorado Statute § 38-8-101, *et seq*.**

387.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

388.    Cox Operating made numerous transfers of funds to LSC between January 1, 2018 and the Petition Date ("**LSC Transfers**"). While all such transfers have not been identified by the Trustee, he has identified the following transfers by Cox Operating and LSC.

389.    The transfers were executed in Louisiana and were made to one or more bank accounts maintained by LSC in Colorado or to creditors of LSC located in Colorado.

390.    LSC gave no consideration for any of the LSC Transfers. Each of the Defendant Transfers reduced the net worth of Cox Operating and the value of its assets.

391.    At the time of each of the LSC Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of the assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the transfers.

392.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of the Colorado Uniform Fraudulent Transfer Act ("CUFTA").

393.    In the alternative, throughout the period between January 1, 2017 and the Petition Date, Cox Operating had unreasonably small capital within the meaning of CUFTA.

394.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

395.    The Trustee is entitled to avoid all LSC Transfers and to recover 150% the sum of all such LSC Transfers pursuant to Section 38-8-105 of CUFTA because the LSC Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to avoid each and every LSC Transfer because the transfers are to recover in damages 150% of the total of all LSC transfers were made at time when LSC was insufficient and LSC gave no consideration whatsoever for any of the transfers.

396.    In the further alternative, the Trustee is entitled to avoid LSC Transfers and to recover the sum of all such LSC Transfers (plus a 50% statute penalty) because (i) there was no consideration given by LSC for each LSC Transfer, much less consideration of a value reasonably equivalent to the value of such LSC Transfers; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the LSC Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

397.    After due proceedings, the Trustee is entitled to a judgment against LSC in the amount of the LSC Transfers plus the statutory damages of 50% of the sum of the LSC Transfers, interest, costs, and other appropriate relief and remedies authorized by Section 38-8-108 of CUFTA.

**COUNT TWENTY-NINE**
**Against LSC for Avoidance of Transfers Made in Violation of TUFTA**

398.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

93

399.     If Texas law applies to the LSC Transfers, the Trustee is alternatively entitled to avoid the transfers made by Cox Operating to LSC pursuant to TUFTA.

400.     From at least January 1, 2017 through the Petition Date, Cox Operating Company made the LSC Transfers. At this time, the Trustee has not identified nor quantified all transfers made to or for the benefit of LSC. Based upon the analysis performed to date, he believes and therefore asserts that the amount of the LSC Transfers is not less than $1.9 million, in addition to the $3.75 million given for the Vail Chalet. The specific transfers are identified in **Exhibit C**.

401.     LSC gave no consideration for any of the LSC Transfers. Each of the LSC Transfers reduced the net worth of Cox Operating and the value of its assets.

402.     At the time of each of the LSC Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the LSC Transfers.

403.     In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

404.     In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

405.     Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

406.     The Trustee is entitled to avoid all LSC Transfers and to recover the sum of all such LSC Transfers pursuant to Section 24.005 of TUFTA because the LSC Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox

94

Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and LSC gave no consideration whatsoever for any of the transfers.

407. In the further alternative, the Trustee is entitled to avoid all LSC Transfers to and to recover the sum of all such LSC Transfers because (i) there was no consideration given by LSC for each transfer received by it from Cox Operating, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the LSC Transfers and would continue to incur routinely through the Petition Date, debts which Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

408. The Trustee is also entitled to avoid all of the LSC Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) LSC gave no consideration for any of the LSC Transfers, or, if any consideration was given, it was consideration which was not of a value reasonably equivalent to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the LSC Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

409. After due proceedings, the Trustee is entitled to a judgment against LSC in the amount of the LSC Transfers, which exceed $1.9 million, in addition to the $3.7 million for the Vail Chalet, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT THIRTY
### Against LSC for Avoidance of the LSC Transfers Pursuant to
### 11 U.S.C. § 548

410. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

411. Alternatively, the Trustee is entitled to avoid the LSC Transfers pursuant to 11 U.S.C. § 548.

412. The LSC Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, the LSC Transfers may be avoided because the LSC Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT THIRTY-ONE
### Against Proteus for Avoidance of Transfers Made in Violation of TUFTA

413. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

414. TUFTA provides a comprehensive statutory scheme through which a creditor may seek recourse for a fraudulent transfer of assets or property.

415. The statute provides a nonexclusive list of "badges of fraud" that may be considered to determine fraudulent intent. The Trustee is entitled to avoid the transfers made by Cox Operating to Proteus pursuant to TUFTA.

416. From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Proteus ("**Proteus Transfers**"). The Trustee has not yet identified or qualified

all of the Proteus Transfers but the analysis performed to date establishes that the Proteus Transfers amount to not less than $20.2 million. The specific transfers are identified in **Exhibit C**.

417.    The Proteus Transfers were intended to pay Proteus for the acquisition, use, maintenance, service, and staffing of jets owned and operated by Proteus. Insiders of Cox Operating, and Brad Cox in particular, routinely employed the jets for personal use.

418.    Proteus gave no consideration for any of the Proteus Transfers or Proteus did provide some value, but in an amount which was not reasonably equivalent to the value of the Proteus Transfers. Each of the Proteus Transfers reduced the net worth and value of the assets of Cox Operating.

419.    At the time of each of the Proteus Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Proteus Transfers.

420.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

421.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

422.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

423.    The Trustee is entitled to avoid all Proteus Transfers and to recover the sum of all such Proteus Transfers pursuant to Section 24.005 of TUFTA because the Proteus Transfers were

97

made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Proteus Energy gave no consideration or grossly inadequate consideration for the transfers.

424.    In the further alternative, the Trustee is entitled to avoid all Proteus Transfers and to recover the sum of all such Proteus Transfers because (i) there was no consideration given by Proteus Energy for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Proteus Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

425.    The Trustee is also entitled to avoid all of the Proteus Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Proteus Energy gave no consideration for any of the Proteus Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Proteus Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

426.    After due proceedings, the Trustee is entitled to a judgment against Proteus in the amount of the Proteus Transfers, which exceed $20.2 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT THIRTY-TWO
### Against Proteus Energy for Avoidance of the Proteus Transfers Pursuant to
### 11 U.S.C. § 548

427.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

428.    Alternatively, the Trustee is entitled to avoid the Proteus Transfers pursuant to 11 U.S.C. § 548.

429.    The Proteus Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

430.    Alternatively, the Proteus Transfers may be avoided because the Proteus Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT THIRTY-THREE
### Against Quarantine Bay for Avoidance of Transfers to Quarantine Bay Made in Violation
### of TUFTA

431.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

432.    The Trustee is entitled to avoid the transfers made by Cox Operating to Quarantine Bay pursuant to TUFTA.

433.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to Quarantine Bay ("**Quarantine Bay Transfers**"). The Trustee has not yet identified or qualified all of the Quarantine Bay Transfers but the analysis performed to date

establishes that the Quarantine Bay Transfers amount to not less than $13.8 million. The specific transfers are identified in **Exhibit C**.

434.    Quarantine Bay gave no consideration for any of the Quarantine Bay Transfers. Each of the Quarantine Bay Transfers reduced the net worth and value of the assets of Cox Operating.

435.    At the time of each of the Quarantine Bay Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Quarantine Bay Transfers.

436.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

437.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

438.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

439.    Trustee is entitled to avoid all Quarantine Bay Transfers to and to recover the sum of all such Quarantine Bay Transfers pursuant to Section 24.005 of TUFTA because the Quarantine Bay Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Quarantine Bay gave no consideration whatsoever for any of the transfers.

440.    In the further alternative, the Trustee is entitled to avoid all Quarantine Bay Transfers and to recover the sum of all such Quarantine Bay Transfers because (i) there was no consideration given by Quarantine Bay for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Quarantine Bay Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

441.    The Trustee is also entitled to avoid all of the Quarantine Bay Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Quarantine Bay gave no consideration for any of the Quarantine Bay Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Quarantine Bay Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

442.    After due proceedings, the Trustee is entitled to a judgment against Quarantine Bay in the amount of the Quarantine Bay Transfers, which exceed $19.3 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

101

**COUNT THIRTY-FOUR**

**Against Quarantine Bay for Avoidance of the Quarantine Bay Transfers Pursuant to 11 U.S.C. § 548**

443.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

444.    Alternatively, the Trustee is entitled to avoid the Quarantine Bay Transfers pursuant to 11 U.S.C. § 548.

445.    The Quarantine Bay Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

446.    Alternatively, the Quarantine Bay Transfers may be avoided because the Quarantine Bay Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

**COUNT THIRTY-FIVE**

**Against RCL Pelican for Avoidance of Transfers Made in Violation of TUFTA**

447.    The Trustee repeats and realleges the foregoing paragraphs as though restated herein in full.

448.    The Trustee is entitled to avoid the transfers made by Cox Operating to RCL Pelican pursuant to TUFTA.

449.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made transfers to RCL Pelican ("**RCL Pelican Transfers**"). The Trustee has not yet identified or qualified all of the RCL Pelican Transfers but the analysis performed to date establishes that the

RCL Pelican Transfers amount to not less than $1.9 million. The specific transfers are identified in **Exhibit C**.

450.    RCL Pelican gave no consideration for any of the RCL Pelican Transfers. Each of the RCL Pelican Transfers reduced the net worth and value of the assets of Cox Operating.

451.    At the time of each of the RCL Pelican Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, RCL Pelican had a negative net worth on the date of each of the RCL Pelican Transfers.

452.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

453.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

454.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

455.    Trustee is entitled to avoid all RCL Pelican Transfers to and to recover the sum of all such RCL Pelican Transfers pursuant to Section 24.005 of TUFTA because the RCL Pelican Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and RCL Pelican gave no consideration whatsoever for any of the transfers.

456. In the further alternative, the Trustee is entitled to avoid all RCL Pelican Transfers and to recover the sum of all such RCL Pelican Transfers because (i) there was no consideration given by RCL Pelican for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the RCL Pelican Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

457. The Trustee is also entitled to avoid all of the RCL Pelican Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) RCL Pelican gave no consideration for any of the RCL Pelican Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the RCL Pelican Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

458. After due proceedings, the Trustee is entitled to a judgment against RCL Pelican in the amount of the RCL Pelican Transfers, which exceed $1.9 million, plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT THIRTY-SIX
### Against RCL Pelican for Avoidance of the RCL Pelican Transfers Pursuant to
### 11 U.S.C. § 548

459.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

460.    Alternatively, the Trustee is entitled to avoid the RCL Pelican Transfers pursuant to 11 U.S.C. § 548.

461.    The RCL Pelican Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

462.    Alternatively, the RCL Pelican Transfers may be avoided because the RCL Pelican Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

## COUNT THIRTY-SEVEN
### Against RC L S Bay for Avoidance of Transfers to Made in Violation of TUFTA

463.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

464.    The Trustee is entitled to avoid the transfers made by Cox Operating to RC L S Bay pursuant to TUFTA.

465.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made the transfers to RC L S Bay ("**RC L S Bay Transfers**"). The Trustee has not yet identified or qualified all of the RC L S Bay Transfers but the analysis performed to date establishes that the

RC L S Bay Transfers amount to not less than $820,000. The specific transfers are identified in **Exhibit C**.

466. RC L S Bay gave no consideration for any of the RC L S Bay Transfers. Each of the RC L S Bay Transfers reduced the net worth and value of the assets of Cox Operating.

467. At the time of each of the RC L S Bay Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the RC L S Bay Transfers.

468. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

469. In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

470. Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

471. Trustee is entitled to avoid all RC L S Bay Transfers to and recover the sum of all such RC L S Bay Transfers pursuant to Section 24.005 of TUFTA because the RC L S Bay Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and RC L S Bay gave no consideration whatsoever for any of the transfers.

472.    In the further alternative, the Trustee is entitled to avoid all RC L S Bay Transfers and to recover the sum of all such RC L S Bay Transfers because (i) there was no consideration given by RC L S Bay for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the RC L S Bay Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

473.    The Trustee is also entitled to avoid all of the RC L S Bay Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) RC L S Bay gave no consideration for any of the RC L S Bay Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the RC L S Bay Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

474.    After due proceedings, Trustee is entitled to a judgment against RC L S Bay in the amount of the RC L S Bay Transfers, which exceed $820,000 plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

107

**COUNT THIRTY-EIGHT**

**Against RC L S Bay for Avoidance of the RC L S Bay Transfers Pursuant to 11 U.S.C. § 548**

475.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

476.    Alternatively, the Trustee is entitled to avoid the RC L S Bay Transfers pursuant to 11 U.S.C. § 548.

477.    The RC L S Bay Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

478.    Alternatively, the RC L S Bay Transfers may be avoided because the RC L S Bay Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

**COUNT THIRTY-NINE**

**Against Windward for Avoidance of Transfers to Made in Violation of TUFTA**

479.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

480.    The Trustee is entitled to avoid the transfers made by Cox Operating to Windward pursuant to TUFTA.

481.    From at least January 1, 2017 through the Petition Date, Cox Operating Company made the transfers to Windward (the "**Windward Transfers**"). The Trustee has not yet identified or qualified all of the Windward Transfers but the analysis performed to date establishes that the Windward Transfers amount to not less than $50,000.

108

482. Windward gave no consideration for any of the Windward Transfers. Each of the Windward Transfers reduced the net worth and value of the assets of Cox Operating.

483. At the time of each of the Windward Transfers, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of the Windward Transfers.

484. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

485. In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

486. Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

487. Trustee is entitled to avoid all Windward Transfers to and recover the sum of all such Windward Transfers pursuant to Section 24.005 of TUFTA because the Windward Transfers were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Windward gave no consideration whatsoever for any of the transfers.

488. In the further alternative, the Trustee is entitled to avoid all Windward Transfers and to recover the sum of all such Windward Transfers because (i) there was no consideration given by Windward for each Transfer, much less consideration of a value reasonably equivalent

to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the Windward Transfers and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

489.    The Trustee is also entitled to avoid all of the Windward Transfers pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Windward gave no consideration for any of the Windward Transfers, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Windward Transfers because the amount of its liabilities significantly exceeded the fair value of its assets.

490.    After due proceedings, Trustee is entitled to a judgment against Windward in the amount of the Windward Transfers, which exceed $50,000 plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

**COUNT FORTY**
**Against Windward for Avoidance of the Windward Transfers Pursuant to 11 U.S.C. § 548**

491.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

492.    Alternatively, the Trustee is entitled to avoid the Windward Transfers pursuant to 11 U.S.C. § 548.

493.    The Windward Transfers, individually and collectively, were made or directed with the actual intent to hinder, delay, or defraud creditors of Cox Operating.

494.    Alternatively, the Windward Transfers may be avoided because the Windward Transfers, individually and collectively, were made with no consideration, or consideration that was not reasonably equivalent in value, and at a time when Cox Operating was (a) insolvent, (b) had unreasonably low capital, and/or (c) routinely incurred debts in amounts beyond its ability to pay as such debts matured.

### COUNT FORTY-ONE
**Against the Members of Cox Operating, LLC for Improper Equity Distributions in
Violation of Louisiana Revised Statute 12:1324 *et seq.***

495.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

496.    Louisiana Revised Statute 12:1324 *et seq.* governs equity distributions made by Louisiana limited liability companies.

497.    Louisiana Revised Statute 12:1327 prohibits distributions to be made if, after giving effect to the distribution, (i) the limited liability company would not be able to pay its debts as they become due in the usual course of business; (ii) the limited liability company company's total assets would be less than the sum of its total liabilities plus, unless the articles of organization or a written operating agreement provides otherwise, the amount that would be needed if the limited liability company were to be dissolved at the time of the distribution to satisfy the preferential rights of other members upon dissolution which are superior to the rights of the member receiving the distribution; or (iii) the authorization or payment thereof would be contrary to any restrictions contained in the articles of organization or a written operating agreement.

498.     From at least January 1, 2017 through the Petition Date, the amount of Cox Operating Company's liabilities substantially exceeded the fair value of its assets. It could not lawfully make distributions or dividends of equity.

499.     Nonetheless, during this time period, Cox Operating made improper and unauthorized "equity" distributions more fully identified above, either directly or indirectly, to Phoenix and CIP (the "**Cox Improper Equity Distributions**"). The specific equity distributions identified to date appear on **Exhibit C.**

500.     The Cox Improper Equity Distributions to Phoenix total at least $44.5 million. Phoenix in turn distributed all or a part of the funds to or on behalf of CIP, Brad Cox, and the Edwin Trust.

501.     The Cox Improper Equity Distributions to CIP total at least $8.4 million.

502.     The transferees of the Cox Improper Equity Distributions knew that Cox Operating's assets exceeded its liabilities as the time the distributions were made, and further knew that Cox Operating would not be able to pay its debts as they became due.

503.     Pursuant to Louisiana Revised Statute 12:1238, each member, if management is reserved to the members, or manager, if management is vested in one or more managers, who knowingly, or without the exercise of reasonable care and inquiry, votes for or assents to a distribution in violation of Louisiana Revised Statute 12:137 shall be liable to the limited liability company for the amount which the member received in violation of such provision.

504.     After due proceedings, the Trustee is entitled to a judgment against the members and/or managers of Cox Operating in the amount of the Cox Improper Equity Distributions made to each respective member, plus interest, costs and other appropriate relief and remedies which are allowed by law.

112

**COUNT FORTY-TWO**

**Against the Members of Cox Operating for Avoidance of Transfers to Made in Violation of TUFTA**

505. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

506. In the alternative, the Trustee is entitled to avoid the Cox Improper Equity Distributions under TUFTA.

507. The Trustee is entitled to avoid the Cox Improper Equity Distributions made by Cox Operating to Phoenix and CIP pursuant to TUFTA.

508. From at least January 1, 2017 through the Petition Date, Cox made the Cox Improper Equity Distributions, either directly or indirectly, to Phoenix and CIP.

509. Phoenix and CIP gave no consideration for any of the Cox Improper Equity Distributions. Each of the Cox Improper Equity Distributions reduced the net worth and value of the assets of Cox Operating.

510. At the time of each of the Cox Improper Equity Distributions, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of Cox Improper Equity Distributions.

511. In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

512. In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

113

513.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

514.    The Trustee is entitled to avoid all of the Cox Improper Equity Distributions to and recover the sum of all such Cox Improper Equity Distributions pursuant to Section 24.005 of TUFTA because the Cox Improper Equity Distributions were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and Phoenix and CIP gave no consideration whatsoever for any of the transfers.

515.    In the further alternative, the Trustee is entitled to avoid all Cox Improper Equity Distributions and to recover the sum of all such Cox Improper Equity Distributions because (i) there was no consideration given by Phoenix and CIP for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business, and (iii) Cox Operating had incurred before the date of each of the Cox Improper Equity Distributions and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

516.    The Trustee is also entitled to avoid all of the Cox Improper Equity Distributions pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) Phoenix and CIP gave no consideration for any of the Cox Improper Equity Distributions, or, if any consideration was given, it was consideration which was not of reasonably equivalent

114

value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the Cox Improper Equity Distributions because the amount of its liabilities significantly exceeded the fair value of its assets.

517.    After due proceedings, the Trustee is entitled to a judgment against Cox Improper Equity Distributions in the amount of the Cox Improper Equity Distributions, which exceed $53 million plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

## COUNT FORTY-THREE
### Against the Members of MLCJR for Improper Equity Distributions in Violation of Tex. Bus. Orgs. Code § 101.206

518.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

519.    Texas Business Organizations Code Section 101.201 *et seq*. governs equity distributions for Texas limited liability companies.

520.    Section 101.206 prohibits distributions by a limited liability company if, immediately after making the distribution, the company's total liabilities exceed the fair value of the company's total assets. Pursuant to 101.206(d), a member who receives a distribution in violation of the section must return the distribution if it has knowledge of the violation.

521.    From at least January 1, 2017 through the Petition Date, the amount of Cox Operating's liabilities substantially exceeded the fair value of its assets. It could not lawfully make distributions or dividends of equity.

522.    Nonetheless, during this time period, Cox Operating also made improper and unauthorized "equity" distributions more fully identified above, either directly or indirectly, to the

holders of the membership interests intended in MLCJR: CIP in the amount of at least $26.5 million, CLS Development in the amount of at least $2.5 million, and WIN in the amount of at least $11 million (the "**MLCJR Improper Equity Distributions**"). The specific transfers identified to date by the Trustee appear on **Exhibit C**. All of these entities distributed all or a portion of those funds to or on behalf of Brad Cox, Management Dallas, and the Edwin Trust. Cox Operating received no benefit or consideration for these distributions totaling not less than $40 million.

523.    The transferees of the MLCJR Improper Equity Distributions knew that Cox Operating's assets exceeded its liabilities as the time the distributions were made, and further knew that Cox Operating would not be able to pay its debts as they became due.

524.    After due proceedings, the Trustee is entitled to a judgment against the members and/or managers of MLCJR in the amount of the MLCJR Improper Equity Distributions made to each respective member, plus interest, costs and other appropriate relief and remedies which are allowed by law.

## COUNT FORTY-FOUR
**Against the Members of MLCJR for Avoidance of Transfers to Made in Violation of TUFTA**

525.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

526.    In the alternative, the Trustee is entitled to avoid the MLCJR Improper Equity Distributions under TUFTA.

527.    The Trustee is entitled to avoid the MLCJR Improper Equity Distributions made by Cox Operating to CIP, CLS Development, and WIN pursuant to TUFTA.

116

528.    From at least January 1, 2017 through the Petition Date, Cox made the MLCJR Improper Equity Distributions, either directly or indirectly, to CIP, CLS Development, and WIN.

529.    CIP, CLS Development, and WIN gave no consideration for any of the MLCJR Improper Equity Distributions. Each of the MLCJR Improper Equity Distributions reduced the net worth and value of the assets of Cox Operating.

530.    At the time of each of the MLCJR Improper Equity Distributions, Cox Operating was insolvent because the amount of its liabilities substantially exceeded the fair value of its assets. As more fully described above, Cox Operating had a negative net worth on the date of each of MLCJR Improper Equity Distributions.

531.    In addition, at all times between January 1, 2017 and the Petition Date, Cox Operating was insolvent because it intended to incur, and, in fact, did incur, debts which it did not and could not pay as they became due within the meaning of Section 24.005(a)(2)(B) of TUFTA.

532.    In the alternative, throughout the period of January 1, 2017 through the Petition Date, Cox Operating had unreasonably small capital within the meaning of Section 24.005(a)(2)(A) of TUFTA.

533.    Certain creditors of Cox Operating were creditors of Cox Operating as of January 1, 2017 and remained creditors of Cox Operating as of the Petition Date.

534.    Trustee is entitled to avoid all MLCJR Improper Equity Distributions to and recover the sum of all such MLCJR Improper Equity Contributions pursuant to Section 24.005 of TUFTA because the MLCJR Improper Equity Distributions were made, individually and collectively, with actual intent to hinder, delay, or defraud creditors of Cox Operating. Alternatively, he is entitled to that relief because the transfers were made at a time when Cox Operating was insolvent and CIP, CLS Development, and WIN gave no consideration whatsoever for any of the transfers.

117

535.    In the further alternative, the Trustee is entitled to avoid all MLCJR Improper Equity Distributions and to recover the sum of all such MLCJR Improper Equity Distributions because (i) there was no consideration given by CIP, CLS Development, and WIN for each Transfer, much less consideration of a value reasonably equivalent to the value of such Transfer; (ii) Cox Operating was engaged in a business for which its assets (net of those transferred) were unreasonably small in relation to its business; and (iii) Cox Operating had incurred before the date of each of the MLCJR Improper Equity Distributions and would continue to incur routinely through the Petition Date, debts which management of Cox Operating (including in particular the Officer & Director Defendants) knew or plainly should have known to be well beyond Cox Operating's ability to pay as they became due.

536.    The Trustee is also entitled to avoid all of the MLCJR Improper Equity Distributions pursuant to Section 24.006 of TUFTA because (i) there are multiple persons who were creditors of Cox Operating before each Transfer and were also creditors of Cox Operating as of the Petition Date; (ii) CIP, CLS Development, and WIN gave no consideration for any of the Cox Improper Equity Distributions, or, if any consideration was given, it was consideration which was not of reasonably equivalent value to the amount of the Transfer; and (iii) Cox Operating was insolvent as of the date of each of the MLCJR Improper Equity Distributions because the amount of its liabilities significantly exceeded the fair value of its assets.

537.    After due proceedings, Trustee is entitled to a judgment against Cox Improper Equity Distributions in the amount of the MLCJR Improper Equity Distributions, which exceed $40 million plus interest, costs, and other appropriate relief and remedies which are authorized by Section 24.008 of TUFTA.

118

## COUNT FORTY-FIVE

**Against Defendant Transferees for Avoidance of Transfers Pursuant to the Louisiana Revocatory Action, Article 2036, *et seq.* of the Louisiana Civil Code**

538.    The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

539.    The Trustee believes that Texas law applies to the transfers to the several Defendant Transferees described in Counts 8 through 40 and 42, above. However, to the extent Louisiana law may apply to these transfers, the Trustee pleads in the alternative that these transfers or distributions may be avoided pursuant to the Louisiana Revocatory Action, Article 2036, *et seq.* of the Louisiana Civil Code.

540.    Louisiana Civil Code Articles 2036 *et seq.* permit the revocation and avoidance of transfers which either cause the transferor to become insolvent or to increase the transferor's insolvency.

541.    Louisiana Civil Code Article 2037 provides that the transferor is deemed to be insolvent if the amount of transferor's liabilities exceed the fair value of the transferor's assets.

542.    From at least January 1, 2017 through the Petition Date, the amount of Cox Operating Company's liabilities substantially exceeded the fair value of its assets, and it was insolvent at all times within the meaning of Article 2037.

543.    During that same time period, Cox Operating Company made the following transfers or distributions defined above:

        a.    Brad Cox Transfers;

        b.    Bradley Trust Transfers;

        c.    Edwin Trust Transfers;

        d.    Gathering Transfers;

119

e.       Cox Interests Transfers;

f.       CIP Transfers;

g.       Cox Oil Transfers;

h.       Eastex Transfers;

i.       Flow Line Transfers;

j.       Half Moon Transfers;

k.       Lochridge P&A Transfers;

l.       LSC Transfers;

m.       Phoenix Transfers;

n.       Proteus Transfers;

o.       Quarantine Bay Transfers;

p.       RCL Pelican Transfers;

q.       RC L S Bay Transfers;

r.       Windward Transfers;

s.       Improper Cox Equity Distributions; and

t.       Improper MLCJR Equity Distributions.

544.     At this time, the Trustee has not identified nor quantified all transfers made to or for the benefit of the Defendants, but they are believed to be in excess of $190 million.

545.     Cox Operating received no consideration for such Transfers or Distributions, and each such Transfer or Distribution resulted in an increase in the insolvency of Cox Operating.

546.     After due proceedings, the Trustee is entitled to a judgment against Defendant Transferees in the amount of the above Transfers and/or Distributions, plus interest, costs, and other appropriate relief and remedies which are allowed by law.

## COUNT FORTY-SIX

### For A Declaratory Judgment that the Transfers By Cox Operating to the Defendants are Nullities

547. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

548. Each of the Transfers defined in Counts 8 through 45 constitutes a contract falling within the scope of article 2029 *et seq.* of the Louisiana Civil Code (individually a "**Contract of Transfer**," and, collectively, the "**Contracts of Transfer**").

549. Each Contract of Transfer is an absolute nullity because each violates a rule of public order. Each Contract of Transfer was intended to and had the effect of looting assets from Cox Operating, impairing and avoiding claims of the creditors and enriching the Officer & Director Defendants and their families.

550. Alternatively, each Contract of Transfer is a relative nullity because, among other reasons, Cox Operating did not have freedom of consent. On the contrary, Officer & Director Defendants abused their control of Cox Operating to loot its assets.

551. The Trustee is entitled to a declaratory judgment that the Contracts of Transfer are absolute nullities or relative nullities. The Trustee is further entitled to the imposition of the remedies set forth in Louisiana Civil Code Article 2033, including returning Cox Operating to its position prior to performance of each of the Contracts of Transfer and Defendants returning to Cox Operating all funds transferred by it to Defendants in connection with the Contracts of Transfer.

## COUNT FORTY-SEVEN

### For Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547

552. The Trustee repeats and realleges the foregoing paragraphs as though stated herein in full.

121

553.    Pursuant to 11 U.S.C. § 103(31), an "insider" of an LLC debtor includes affiliated individuals and entities (and insiders thereof) and managing agents.

554.    All Defendants named herein are insiders of Cox Operating pursuant to 11 U.S.C. § 103(31) because they are affiliated entities or affiliated individuals.

555.    Transfers to insiders made within one year before the Petition Date (the "**Preference Period**") are avoidable pursuant to 11 U.S.C. § 547(b)(4).

556.    During the Preference Period, Cox Operating made transfers to Defendants Flow Line, Lochridge P&A, LSC, Phoenix, Proteus, RCL Pelican, RC L S Bay and Brad Cox (the "**§ 547 Transfers**"). The specific transfers identified to date by the Trustee that were made to Defendants Flow Line, Lochridge P&A, LSC 27, Phoenix, Proteus, RCL Pelican, and RC L S Bay appear on **Exhibit C**. The specific transfers identified to date by the Trustee that were made to Defendant Brad Cox total at least $11.4 million in salary/compensation (or $950,000 per month).

557.    During the Preference Period, Defendants Flow Line, Lochridge P&A, LSC, Phoenix, Proteus, RCL Pelican, and RC L S Bay were creditors of Cox Operating within the meaning of section 547(b)(1) of the Bankruptcy Code at the time of each § 547 Transfer by virtue of supplying goods and/or services for which Cox Operating was obligated to pay.

558.    The § 547 Transfers were transfers of an interest in Cox Operating's property.

559.    According to the Debtors' books and records, the § 547 Transfers were made to, or for the benefit of, the Defendants because the § 547 Transfers either reduced or fully satisfied a debt or debts then owed by Cox Operating.

560.    The § 547 Transfers were made for or on account of antecedent debts owed by the Debtors.

561.    The § 547 Transfers were made while Cox Operating was insolvent. The Trustee is entitled to the presumption of insolvency for the § 547 Transfers made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

562.    Cox Operating's general unsecured creditors will receive less than full value on account of their allowed claims against Cox Operating's Estates.

563.    The § 547 Transfers were made on or within one year of the Petition Date.

564.    The § 547 Transfers enabled Defendants Flow Line, Lochridge P&A, LSC, Phoenix, Proteus, RCL Pelican, RC L S Bay and Brad Cox to receive more than they would receive if (a) Cox Operating's case was a case under chapter 7 of the Bankruptcy Code, (b) the § 547 Transfers had not been made, and (c) Defendants Flow Line, Lochridge P&A, LSC, Phoenix, Proteus, RCL Pelican, RC L S Bay and Brad Cox received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

565.    By reason of the foregoing, each § 547 Transfer should be avoided and set aside as a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.[48]

## DEMAND FOR JURY TRIAL

The Trustee demands a trial by jury.

---

[48] During the course of this Adversary Proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made by any of the Debtors to the Defendants during the Preference Period or that may be avoidable under other provisions of the Bankruptcy Code. While the Transfers identified in **Exhibit "C"** and as set forth herein, address transfers by Cox Operating, the Trustee continues to review the Debtors' books and records, and may uncover other transfers, either by such review or through discovery, made by Cox Operating and/or the other Debtors to or for the benefit of the Defendants.  It is the Trustee's intention to avoid and recover all avoidable transfers of property made by the Debtors, as well as interests of the Debtors in property, to or for the benefit of the Defendants or any other transferee. The Trustee reserves the right to amend this Complaint to include, *inter alia*, the following: (a) further information regarding the Transfer(s); (b) additional transfers; (c) modifications of and/or revision to Defendants' name; (d) additional defendants; (e) additional Debtor Estates; and/or (f) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to the Trustee at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the date of filing of this Complaint

WHEREFORE, Michael D. Warner, acting solely in his capacity as the Chapter 7 Trustee of Cox Operating and the other Debtors respectfully requests that after due proceedings had that a judgment in his favor and against each and all of the Defendants be awarded all appropriate damages, costs, interest and other relief including the following:

1.    An award against Brad Cox, Craig Sanders, and Vincent DeVito, jointly and solidarily, for all damages arising from their multiple and egregious breaches of fiduciary and other legal duties;

2.    An award for the avoidance and revocation of the Bradley Trust Transfers.

3.    An award for the avoidance and revocation of the Edwin Trust Transfers.

4.    An award for the avoidance and revocation of the Brad Cox Transfers.

5.    An award for the avoidance and revocation of the CLS Development Distributions.

6.    An award for the avoidance and revocation of the CIP Distribution.

7.    An award for the avoidance and revocation of the Phoenix Distributions.

8.    An award for the avoidance and revocation of the WIN Management Distributions.

9.    An award for the avoidance and revocation of the Gathering Transfers.

10.    An award for the avoidance and revocation of the Cox Interests Transfers.

11.    An award for the avoidance and revocation of the Cox Oil Transfers.

12.    An award for the avoidance and revocation of the Eastex Transfers.

13.    An award for the avoidance and revocation of the Flow Line Transportation Transfers.

14.    An award for the avoidance and revocation of the Half Moon Transfers.

15.    An award for the avoidance and revocation of the Lochridge P&A Transfers.

16.    An award for the avoidance and revocation of the LSC Transfers.

124

17.    An award for the avoidance and revocation of the Proteus Transfers.

18.    An award for the avoidance and revocation of the Quarantine Bay Transfers.

19.    An award for the avoidance and revocation of the RCL Pelican Transfers.

20.    An award for the avoidance and revocation of the RC L S Bay Transfers.

21.    An award for the avoidance and revocation of the WIN Transfers.

22.    An award for the avoidance and revocation of the Windward Transfers.

23.    An award for the avoidance of the § 547 Transfers.

24.    A declaratory judgment that Defendants have abused and ignored their separate corporate existence and constitute a single business enterprise and alter ego of Cox Operating and are jointly solidarily liable for all debts and other obligations of Cox Operating and the other Debtors;

25.    A declaratory judgment to the effect that the Contracts of Transfer, as defined in Count 45, individually and collectively, are absolute and/or relative nullities, and, as a result, the Trustee is entitled to the remedies set forth in Louisiana Civil Code Article 2033.

26.    A declaratory judgment to the effect that the Trustee is the true and lawful owner of the Vail Chalet.

27.    A declaratory judgment to the effect that the Trustee is the true and lawful owner of the Crespi Estate.

28.    Exemplary and punitive damages as may be determined by the jury;

29.    Costs, interest, and attorneys fees; and

30.    Such other and further relief as may be just and equitable.

Dated: May 14, 2025

[Signature block on following page]

125

Respectfully submitted,

*/s/ Brent B. Barriere*

Brent B. Barriere, La. Bar No. 2848
Kerry J. Miller, La. Bar. No. 24562
Kaja S. Elmer, La. Bar No. 35568
Julie S. Meaders, La. Bar No. 39984
Margaret Daly, La. Bar No. 40331
FISHMAN HAYGOOD, LLP
201 St. Charles, 46th Floor
New Orleans, LA 70170
T: (504) 585-5252
F: (504) 586-5250
bbarriere@fishmanhaygood.com
kmiller@fishmanhaygood.com
kelmer@fishmanhaygood.com
jmeaders@fishmanhaygood.com
mdaly@fishmanhaygood.com